# RICHARD P. ROSENBERG *v.* STATE OF MARYLAND

[No. 530, September Term, 1970.]

*Decided May 4, 1971.*

The cause was argued before ORTH, THOMPSON and MOYLAN, JJ.

*David Povich,* with whom were *Williams & Connolly, James J. Cromwell* and *Clark & Cromwell* on the brief, for appellant.

*Clarence W. Sharp, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, William A. Linthicum, Jr., State's Attorney for Montgomery County, John M. King, Assistant State's Attorney for Montgomery County,* and *Walter H. Madden, Assistant State's Attorney for Montgomery County,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

### The Indictment

The offense which a jury in the Circuit Court for Montgomery County was convinced beyond a reasonable doubt had been committed by Richard P. Rosenberg was that he kept and maintained a common nuisance on 28 February 1970. Not the common law misdemeanor of common nuisance recognized in Maryland for which the penalty is fixed by statute, Code, Art. 27, § 125 and which we defined and discussed in *Ward v. State,* 9 Md. App. 583, 586-587, but the statutory felony of common nuisance under Code, Art. 27, § 291, wherein it was defined, and Art. 27, § 300 wherein it was classified and the penalty for its violation fixed. Section 291 read:

> "Any store, shop, warehouse, dwelling house, building, vehicle, boat, aircraft, or any place whatever, which is resorted to by narcotic drug addicts for the purpose of using narcotic drugs or which is used for the illegal keeping or selling of the same, shall be deemed a common nuisance. No person shall keep or maintain such common nuisance." [1]

1. Chapter 403, Acts 1970, effective 1 July 1970, repealed former §§ 276-313 D of Art. 27 and enacted new §§ 276-302. Section 286 (a) (5) provides that it shall be unlawful, except as authorized, for any person "To keep or maintain any common nuisance which

So a place is a common nuisance when it is:

   (1)  resorted to by narcotic drug addicts for the
       purpose of using narcotic drugs; or
   (2)  used for the illegal
       (a)  keeping, or
       (b)  selling
       of narcotic drugs.

The charge of which appellant was convicted was the 2nd count of the indictment returned against him. It alleged that on 28 February 1970 he "* * * unlawfully did keep and maintain as a common nuisance a building, to wit, a garage, located at 13814 Parkland Drive, Rockville, Montgomery County, Maryland, for the purpose of illegal selling of narcotic drugs, to wit, 'Robitussin A-C', in violation of Article 27, Section 291, of the Annotated Code of Maryland, * * *." [2]

It is obvious that the Grand Jury was attempting to allege that the garage kept and maintained by appellant was a common nuisance because it was "used for the illegal selling" of narcotic drugs. However, in drafting the allegation, language of the statute applicable only to that part we have above designated (1), namely, "for the purpose of", was used to allege that part which we have

---

shall mean any dwelling house, apartment, building, vehicle, vessel, aircraft, or any place whatever which is resorted to by drug abusers for purposes of illegally administering controlled dangerous substances or which is used for the illegal manufacture, distribution, dispensing, storage or concealment of controlled dangerous substances or controlled paraphernalia, as defined in subsection (d) of § 287 of this subheading." By § 277 (1) "distribute" shall mean to "deliver" and by § 277 (i) "deliver" shall mean "the actual, constructive, or attempted transfer, exchange, or delivering of a controlled dangerous substance from one person to another with or without remuneration, whether or not there exists an agency relationship." Thus "distribution" includes "sale". See also Art. 27, § 288 (a) (6).

2. The 1st count alleged that he did keep and maintain the common nuisance "for the purpose of illegal keeping of" Robitussin A-C in violation of the statute. The verdict of the jury as disclosed by the docket entries was "guilty on 2nd Count of Indictment." See *Agresti v. State*, 2 Md. App. 278, note 1 at 280.

above designated (2) (b), so that instead of presenting that the garage was a common nuisance as "used for the illegal selling of narcotic drugs", the applicable language of the statute, the allegation was that it was "for the purpose of illegal selling of narcotic drugs." Appellant does not claim that he was misled but he argues that as drawn the count does not charge a proscribed offense. The general rule is that an indictment is sufficient if it describes the offense in the words of the statute, *Baker v. State*, 6 Md. App. 148. Appellant urges that the language of the statute was not used. "Maintaining a garage for the purpose of illegal sale is not the equivalent of maintaining a garage which has not been so used. A garage * * * may be maintained for the purpose of selling narcotics without ever having been so used. Under the indictment, no actual use is required whereas the statutory offense clearly includes actual use as a necessary element or as an essential ingredient of the offense." We find the language of Murphy, C.J., speaking for the Court in *Ward v. State, supra,* apposite:

> "Contrary to appellant's contention, we think the information in this case properly charged an offense over which the court had jurisdiction. The rule which seems to be generally recognized draws a line of demarcation between an indictment or information which completely fails to state an offense and one which alleges all the elements of the offense intended to be charged and apprises the accused of the nature and cause of the accusation against him, even though it is defective in its allegations or is so inartfully drawn that it would be open to attack in the trial court. *Putnam v. State*, 234 Md. 537; *Baker v. State, [supra]*."

The count here specified that appellant unlawfully did keep and maintain a garage as a common nuisance in vio-

lation of Code, Art. 27, § 291. Whether the facts alleged were such as constituted a nuisance within the meaning of the statute was a matter of evidence. At most the count was open to challenge on sufficiency grounds—not that it failed to state an offense—but that it did so imperfectly by failing on its face to inform sufficiently the accused of the precise nature of the nuisance with which he was charged, thus entitling him prior to trial to move to dismiss the count under Maryland Rule 725 b or to a bill of particulars under Rule 715.[3] But this was not the ground upon which appellant sought dismissal of the charge. He claimed, at the close of evidence offered by the State, that it failed to state an offense. We think it did; it stated the statutory offense of common nuisance.

## The Sufficiency of the Evidence

Appellant claims that the trial court erred in denying his motion for judgment of acquittal made at the close of all the evidence because the evidence and rational inferences therefrom were not sufficient for the jury to be convinced beyond a reasonable doubt that the garage was used for the illegal selling of narcotic drugs. *Williams v. State,* 5 Md. App. 450. We agree that under the statute for the garage to be deemed a common nuisance the State must establish that it was in fact used for the illegal selling of narcotic drugs. By statutory definition " 'sale' includes barter, exchange or offer therefor, and each such transaction made by any person, whether as principal, proprietor, agent, servant or employee." Code, Art. 27, § 276 (k). The dictionary definition of each of these words encompasses the receipt of something in return

---

3. As the Court noted in *Ward,* at 588, note 1:
"An indictment is sufficient if it informs the person charged of the accusation against him as required by Article 21 of the Maryland Declaration of Rights and if the charge is made with sufficient definiteness to prevent the accused from being charged again with the same offense in a future prosecution. *Leet v. State,* 203 Md. 285."

for the goods sold, bartered or exchanged as distinguished from a gift.[4]

Officer Richard A. Bias, assigned to the Narcotics Section of the Metropolitan Police Department, testified that he went to 13814 Parkland Drive about 3:30 P.M. on 28 February 1970 to search a garage on the property under the authority of a search warrant. "We met with other officers and agents of the Federal Bureau of Narcotics, and we found the garage." In the garage were 87 cases, each containing 24 four ounce bottles labeled Robitussin A.C. Cough Syrup and 24 cartons, each containing a one-gallon jug of the same prescription. Fourteen of the cartons had the word "ACTING" stamped on them under the horizontal bar in the letter "H" in the name "A.H.Robbins" on the cartons. There were no other markings on the cartons. "All of them had been peeled to the point where there was no other markings on them." The bottles and jugs were taken to the Office of the Bureau of Narcotics and Dangerous Drugs.

On 11 February Bias placed the Petworth Pharmacy, 4201 Georgia Avenue, N.W., under surveillance. It was not until 8:55 P.M. on 13 February that he observed any unusual activity. At that time a delivery man came out of the pharmacy pushing a large hand truck on which were about 11 cases like those later found in the garage; they had the name A.H.Robbins on the top of them and "the remainder of the labels peeled off outside of the cartons." He placed the cartons in the trunk of a '69 or '70 Rambler Hornet parked beside the store. He put three loads of about 11 cases each and a fourth load of about 7 cases in the car. He then drove it away about 9:35 P.M. The police followed the car but lost contact

---

4. Sale: "The exchange of property or services for a determined amount of money or its equivalent."
   Barter: "To exchange goods or services without using money."
   Exchange: "To transfer goods or services for something of equal value."
   Gift: "Something that is bestowed voluntarily and without compensation."
The American Heritage Dictionary of the English Language.

with it. Surveillance on the pharmacy was continued. On 25 February the delivery man again brought cartons from the store, placing them in a dark green Rambler with the name of the pharmacy stencilled on the doors. Four hand truck loads of cartons were put in the car, some in the trunk, some in the rear of the car, stacked all the way even with the windows. The name A.H.Robbins was on the cartons, but other labels had been peeled off. About 10:25 P.M. when the store closed, appellant drove away in the Rambler. He went to 13814 Parkland Drive, backed the car up the driveway to the garage, took the cartons out of the car and put them in the garage. There were also other cartons in the garage. On 27 February, Bias had 13814 Parkland Drive under surveillance. About 10:45 P.M. the Rambler drove up, parked in front of the house and appellant got out and entered the house. Three to five minutes later a dark colored Mercury pulled up in front of the house. Its lights went out and it was backed up the driveway to the garage. Three "negro males" got out of the car. Appellant came out of the house and several cases from the garage were loaded in the Mercury. The lights in the garage were on but the windows were painted "so you can't see through them." But through the garage door Bias saw appellant hand at least three cartons to the other men to load in their car. The three men drove away in the Mercury. The officers followed it. On route 108 about a mile west of route 29, after traveling at a high rate of speed it suddenly pulled into a bar or restaurant on the right side of the road. The police proceeded past, turned around and came back. The car and the men were still by the bar. The police drove by and went down the road to turn around. As they were coming back the car left the bar at a high rate of speed. They lost it.

Officer Edmund K. Mackinnon of the Metropolitan Police Department assigned to the Narcotics Section testified that on 20 February while checking various wholesalers he "personally marked 25 cases of Robitussin A.C.

28

which were scheduled for shipment to the Petworth Pharmacy" by stamping the word "ACTING" on them "on the crossbar of the 'H.' in 'A.H.Robbins' which was printed on each carton." He saw 25 cases he had marked loaded on a truck, followed it to Petworth Pharmacy and observed the cases being unloaded and taken into the store. He said that appellant "is listed as the Vice President of the corporation, trading as Petworth Pharmacy" and, to the best of his knowledge, appellant "is not a pharmacist." Mackinnon and John R. Panetta, special agent of the Justice Department, Bureau of Narcotics and Dangerous Drugs observed the activities of appellant on 25 February as recounted by Bias.

Special Agent Charles W. Cecile, Jr. of the Bureau of Narcotics and Dangerous Drugs, United States Department of Justice, testified that he removed "a portion of the bottles from the random selection of the boxes" seized in appellant's garage "and turned them over to the chemist" for the Bureau for analysis. He submitted 74 four ounce bottles and 6 gallon jugs to the chemist. It was stipulated that each bottle received by the chemist, which contained Robitussin A-C, had therein not more than one grain of codeine per fluid ounce and that codeine was listed as a narcotic drug in Code, Art. 27, § 276.

It is patent that there was no direct evidence that money or something of equal value was received in exchange for the Robitussin stored in the garage. The question is whether the evidence adduced supported a rational inference that the garage was used for selling the cough syrup containing the narcotic drug, codeine. The lower court addressed itself directly to the issue. It said that it must reject the argument that there was not sufficient evidence to permit the trier of fact to find beyond a reasonable doubt that the garage was used for the illegal selling of narcotic drugs. It gave as the reasons for its conclusion:

"One is the sheer staggering quantity itself of what was found in the garage, which, of

course, had been reduced only the evening before by that quantity which was removed by the three men to their automobile, to the Mercury.

Two, the fact that the windowpanes in the garage had been painted so as to be opaque.

Three, is the transfer made only the evening before within twenty-four hours of the seizure to the three men at night, and the total circumstances under which that was described, including up to the point where the surveillance of the three men was terminated by what I think can fairly be described as and would permit an inference of evasive efforts by those three men, that is the evasive action to thwart a surveillance by the trailing police officers; and I think that when that is taken into account together with what else was described, that it is fair to —insofar as adjectives are important—characterize those actions as furtive at night; the dispatch with which shortly after the Defendant arrived and the men pulled up suggesting the precision of the appointment; and the rapidity with which this all occurred in less than ten minutes, variously described as eight to ten minutes; the fact that these three men were not from the neighborhood, and were from at least as far away as the evidence would permit Ellicott City or thereabouts; and the fact that it came sometime after ten o'clock at night; and was from the garage and not from Petworth Pharmacy; next is the quantity, of course, of the amount sold to Petworth Pharmacy by the wholesaler as shown by their records.

There is no evidence in the case of the cost of the Robitussin A.C., but under any reasonable inference—we are not talking about something which was of no value or even little value —because of the quantity in the garage, and we

are talking about a quantity that is sufficient to supply a lot of people for 48 hours, that is the bulk quantity and the 4 oz. bottles; the fact that the labeled portion Robitussin A.C. was torn off the boxes; and the fact that there were present gallon jugs; when, for example, as the officer said, only four ounces per 48 hours was allowed without prescription; but it required no evidence of that kind to suggest that it is not within normal contemplation for it to be sold to a non-prescription customer in a jug quantity.

I think it is a fair inference that the jug contents were for—contemplated to be dispensed pursuant to a prescription, that is to be handled by a pharmacist into another smaller container with a prescription label on the bottle, maybe more than four ounces.

All this coupled together, being the salient points and not ignoring, of course, the totality of the evidence, are sufficient to permit a rational inference that one, it was not in the garage to be consumed by the Defendant, that it was not there as any warehouse or storage place for Petworth Pharmacy, and it was not there to be given away; and to state it positively rather than negatively are sufficient to permit an inference, a rational inference, that it was there to be sold and that whenever it left those premises it was being sold; * * *."

We agree that in the totality of the circumstances as shown by the evidence it was a rational inference that the garage was used for selling narcotic drugs. We hold that the lower court did not err in denying the motion for judgment of acquittal.

*The Jury and the Search Warrant*

State's Exhibit A was a federal search and seizure warrant, issued by a judge of the Circuit Court for

Montgomery County, which was offered on a motion to suppress heard prior to trial and received in evidence but with the understanding of the court and all parties that it would not be submitted to the jury "due to the conclusory nature of the document with respect to certain factual matters which were very much in issue at the trial." According to the transcript of the proceedings the court instructed the jury and counsel presented arguments to them. The jury was then sent to lunch, after being properly cautioned, attended by the bailiff. They were directed to return directly to the jury room to deliberate their verdict. The jury retired to deliberate their verdict at 1:00 P.M. and the verdict was given at 2:50 P.M. After a short discussion about the verdict, one of the defense counsel addressed the court. The transcript reads:

> "MR. CROMWELL (Defense Counsel): There was one other matter, Your Honor; and that is with respect to the Exhibit that went into the jury room.
>
> The jury returned a verdict approximately 2:50. Around 2:15 or 2:30 I came into the courtroom to inquire what Exhibits had been sent in to the jury room.
>
> I understand from checking that among the Exhibits which were sent in to the jury room was sent in State's Exhibit marked 'A' for identification, which was not in evidence.
>
> It was the search warrant in this case.
>
> I believe that under the circumstances that we would want the record to show at this point clearly that State's Exhibit A for identification was in fact delivered into the jury in connection with their deliberations.
>
> I don't know how it happened to get in there but in any event, it was apparently sent in to the jury.

THE COURT: Yes. The Court has been informed by the bailiff that what is marked as State's Exhibit A, which is the search warrant, a xerox copy of two sheets of paper, the first sheet being the search warrant itself issued out of the United States District Court, but over the signature of Judge Moore of this court, for the garage; and the second page is the return, is a xerox copy of the return, and also lists the inventory of what was taken pursuant to the warrant and such as appears from the evidence in this case before the jury, that is the contents thereof.

The explanation is that it was sent in inadvertently while counsel and the Court were absent from the courtroom upon the return of the jury from lunch.

MR. CROMWELL: I simply wanted the record to reflect at this point—I'm not taking any action with respect to it at this point.

THE COURT: I understand that.

MR. MADDEN (Assistant State's Attorney): This is the first knowledge that the State has had that the Exhibit was with the other exhibits.

THE COURT: You were not here at the time the Court was informed by the bailiff, and at or about the same time apparently counsel for the Defendant learned of it. Apparently they were in the courtroom.

I think that fairly reflects what transpired as far as what the Court knows and as far as any court personnel have informed the Court.

I suppose out of an abundance of caution it ought to be made clear in connection with the Exhibit A that no other papers received in evidence in motion to suppress proceeding as warrants or papers associated therewith went to the jury in this case.

MR. CROMWELL: It is my understanding that

the affidavit which was originally part of the—
was termed Federal Warrant was not sent in to
the jury room, but that the warrant and the
return were sent in which are collectively
marked.

THE COURT: Yes; on the Federal Warrant.

MR. CROMWELL: On the Federal Warrant.

THE COURT: Those are the only papers which
would loosely be described as warrants and re-
lated papers that did go into the jury room.
Anything else?

MR. MADDEN: I wanted to make sure it is just
a federal warrant alone that was marked as Ex-
hibit A that went into the jury room?

THE COURT: What was marked Exhibit A
went in the jury room inadvertently, and it con-
sisted of the front page warrant signed by
Judge Moore and the second page, which was
the return of inventory on which there are listed
items which have gone into evidence; that is by
reference and description as well as by photo-
graphs.

I think what we're not saying is that the—noth-
ing associated with the house search went into
the jury room.

MR. MADDEN: I wanted to make sure the rec-
ord was clear on that. Thank you, Your Honor."

It seems clear that defense counsel knew what had
occurred while the jury was still deliberating and elected
to await the verdict. He did not request any action of the
court at the time he first became aware of the incident
and even shortly after verdict stated he was "not taking
any action with respect to it at this point." But he then
presented the point as a ground for a new trial and now
claims error in the court's refusal to grant it.[5]

---

5. In his remarks when denying the motion the court noted that
it had asked defense counsel upon learning what had occurred
what he wished to do? Counsel's answer was "to the effect that 'We
will wait and see what the jury does.'"

The Court of Appeals in *State v. Devers and Webster,* 260 Md. 360 made clear that a motion for a new trial is within the sound discretion of the trial court and may not be reviewed on appeal, but intimated that a new trial might be reviewable on appeal where there was a clear abuse of discretion by the trial court and said that denial of a new trial where the motion is grounded on newly discovered evidence may well be just such a clear abuse of discretion as will make the denial reviewable. At 375-376.

The comments of the lower court here in denying the motion for a new trial covered some 21 pages when transcribed. They reflect the careful consideration given the matter. It decided: "[B]ecause it feels that the delivery and presence of the search warrant with the petit jury for a period of what appears to be approximately fifteen minutes in no way prejudices this defendant and has no part whatsoever in the jury's verdict, the Court is constrained to deny the motion for a new trial." We have carefully considered the findings and conclusions expressed by the lower court in reaching this decision. We cannot say that the denial of the motion for a new trial was an abuse of its discretion with respect to the question presented to us.

### The Motion for the Return of Monies Seized

Code, Art. 27, § 551, after provisions for the issuance of a search warrant, its contents and the time of the search, deals with the disposition of property seized. It prescribes:

> "If, at any time, on application to a judge of the circuit court of any county or of the Criminal Court of Baltimore City, it appears that the property taken is not the same as that described in the warrant or that there is no probable cause for believing the existence of the grounds on which the warrant was issued, or

that the property was taken under a warrant issued more than fifteen (15) calendar days prior to the seizure, said judge must cause it to be restored to the person from whom it was taken; but if it appears that the property taken is the same as that described in the warrant and that there is probable cause for believing the existence of the grounds on which the warrant was issued, then said judge shall order the same retained in the custody of the person seizing it or to be otherwise disposed of according to law."

Prior to trial appellant filed a motion to suppress evidence seized from the garage and premises at 13814 Parkland Drive on the ground that it was obtained by an unreasonable search. Rule 729 b 1. The motion was determined as a preliminary matter, Rule 729 d. At the hearing it was adduced that two warrants were issued, a federal warrant and a State of Maryland warrant. The federal warrant, introduced as State's exhibit A was for the search of the garage and authorized the seizure of "Robitussin A.C., a narcotic drug, * * * any other narcotic drugs unlawfully held, paraphernalia used in the unlawful distribution of Robitussin A.C. or any other narcotic drug" * * * and "[a]ny papers or records indicating the purchase and distribution of narcotic drugs which are of a material nature in the prosecution of violation Title 26 USC 4705 a, Title 26 USC 4702 (a) (2) (A) * * *." The return showed the seizure of Robitussin A.C.—87 cases, each case containing 24 four ounce bottles, 24 one gallon jugs, and 2 empty cartons labeled Robitussin A.C. Two copies of the State warrant were introduced by appellant as his exhibits 1 and 2. It authorized the search of the premises 13814 Parkland Drive and the garage and the seizure of "Robatusin [sic] AC, a codeine based cough syrup. Records pertaining to the sale of Robatusin AC a codeine based cough syrup. And monies received in the transaction of the sale of Roba-

tusin AC a codeine based cough syrup." The inventory of articles seized included "1. $103,428.23 cash U. S. currency in $100, $50, $20, $10, $5, and $1 dollar bills". The lower court found that "both warrants were issued on probable cause." It added: "Moreover, the Court determines that with respect to the search warrant that there was probable cause from the affidavits [6] for the officers to believe that the Robitussin was located in the garage for the purpose of being sold; and in this sense there was—coupled with all the other facts contained in the applications—there was probable cause for them to believe that the proceeds thereof were in the house and, therefore, there was probable cause for the officers to believe not only that the garage contained Robitussin, but thereafter that the house contained Robitussin, records pertaining thereto, that is pertaining to the sale thereof, and the money as the fruits or results of such a sale or sales." Having determined that the warrants were issued on probable cause the court then received testimony on two points. The first, whether the seizure of amphetamine was illegal because "the warrant and application failed to list amphetamine as being contained in the house and sought," is not before us. The second was that "the seizure of the $103,000 was outside, as it were, the warrant in that there is nothing to link that money to the sale of Robitussin." The court, after considering the evidence adduced at the hearing, held that appellant "for the purposes of this motion * * * simply has failed to sustain the burden imposed on him in this motion to show that the money was illegally seized in execution of the warrant." But it continued:

"There is, however, an anomoly which arises in this case as I see it in that notwithstanding the ruling which the court makes for purposes of this motion, based largely on procedural grounds, I should say entirely on procedural

---

6. The affidavits are not included in the record before us.

grounds in the final analysis, that absent any independent evidence not disclosed by the motion, by the hearing on the motion, it is problematical to the Court whether the money would be admissible in the trial of this case purely on evidentiary grounds, wholly apart from any Fourth Amendment considerations."

At the trial on the merits the State did not offer the money seized.

Subsequent to appellant's conviction but prior to the imposition of sentence, he filed a motion for the return of the money and Robitussin seized.[7] Upon hearing the lower court denied the motion "without prejudice."

Appellant in his brief claims error in the denial of his "motion for suppression and return of the money." Of course, there were two motions filed and determined. The first, filed 1 June 1970, and determined prior to the trial on the merits was concerned only with the suppression of the evidence seized under authority of the warrants. Although, upon denial of this motion, objection to the evidence sought to be suppressed was preserved on appeal even had no further objection been made to its introduction at the trial, Rule 729 f, appellant does not present a question on appeal going to the validity of the seizure of the Robitussin, evidence as to which was introduced through testimony of the officers. The money was not introduced nor was evidence concerning it. Thus the

---

7. The jury found appellant guilty on 10 June 1970. The motion was filed 29 July 1970. It seems from the docket entries that the court disposed of the motion on 26 August and the same date imposed sentence. As exhibits to the motion were copies of a jeopardy assessment filed against appellant on 16 March 1970 by Internal Revenue Service in the amount of $110,158.79 for tax liability, a bill of complaint for injunction, declaratory judgment and other relief filed by appellant in the United States District Court for the District of Baltimore, Maryland relating to the assessment, an escrow agreement with respect to the monies held by the Montgomery County Police Department between appellant, the Commissioner and District Director of IRS and appellant's attorneys, and an assignment agreement as to the monies between appellant and his attorneys.

propriety of the denial of the pretrial motion to suppress is not before us.

The second motion, filed after the trial on the merits, was for the return of the monies and the Robitussin seized. It alleged that the money was not introduced in evidence by the State and that the Robitussin was introduced "through the testimony of a chemist as to sampling." It stated that "in communication with the County Attorney's Office, it was indicated that they would have no objection to release of the funds" and that both the County Attorney and State's Attorney were being served with a copy of the motion. It pointed out that in view of the escrow agreement and assignment agreement there would be "no substantial release of any funds to the Defendant should the Court grant release of the case," although appellant's tax returns had not yet been filed, "thus making it uncertain at this time as to the exact tax liability which is in dispute." The basis for the motion to return the cash and property was, as we understand the motion, that "[d]epriving the Defendant of the utilization of the funds will deprive him of substantial interest. This has particularly serious consequences in today's economy. The Court is requested to take judicial notice of the substantial deprivation and irreparable injury being suffered by the Defendant due to his inability to utilize his own assets. The County cannot compensate him for such loss of use [nor are there provisions for such compensation]."

The motion does not seek to apply Art. 27, § 551 and the transcript of the proceedings below on the motion are not included in the record before us. See Rule 1026 c. 2. Appellant now urges that the denial of the motion was error because there was "absence of any evidence indicating that the money seized by the police officers was "monies received in the transaction of the sale of Robitussin A-C, a codeine based cough syrup." Whether or not the question now presented was tried and decided below on the motion to return the property is not dis-

closed by the record. We feel that the propriety of the lower court's denial without prejudice of the motion of 29 July 1970 is not properly before us for review.[8]

*Judgment affirmed. Costs to be paid by appellant.*

8. The true bill was filed 4 March 1970. On 9 March Jules Fink, Esq. requested that his appearance "[and David Povich, Esq. of counsel]" be entered as attorneys for appellant. By order of 11 March 1970, motion having been made in open court, N. David Povich of the firm of Williams and Connolly was admitted as counsel *pro hoc vice*. On 8 June 1970 James J. Cromwell, Esq. requested his appearance be entered for appellant. The transcript of the pretrial hearing and the trial states that Povich and Cromwell represented appellant. Appellant's brief was submitted by Cromwell of "Clark and Cromwell" with Povich "Of Counsel." Oral argument was made by Povich. Motion for a new trial was made by Povich and Cromwell on 12 June 1970. The motion of 29 July 1970 was filed by Jules Fink and Sylman I. Euzent of Euzent, Katz and Fink. It was that firm which was party to the escrow agreement and the assignment agreement and which was designated counsel for appellant in the Bill of Complaint for Injunction, etc.