# SAMUEL A. GREEN, JR. *v.* STATE OF MARYLAND

[No. 791, September Term, 1974.]

*Decided May 1, 1975.*

The cause was argued before MORTON, MENCHINE and LOWE, JJ.

*James R. White* for appellant.

*Gary Melick, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Clarence W. Sharp, Assistant Attorney General, Chief of Criminal Division,* and *Peter D. Ward, Assistant Attorney General,* on the brief, for appellee.

LOWE, J., delivered the opinion of the Court.

## Prologue

The continued existence of an elected official as an elected official depends not only upon his ability to "resist the temptations that daily beset him," but also upon his ability to make it apparent that he has resisted them. Few, if any, elected officials have survived a long political life without some impugning of their motives. This, the public figure must be content to bear,[1] or alternatively, his defense can be

---

1. " ... even from those who should be his friends; .... " from an encomium delivered by Senator William Pitt Fessenden of Maine, in 1866. J. F. Kennedy, *Profiles in Courage.*

to open himself to the rigid scrutiny of those who hold him suspect. Indeed the temper of the times compels one to endure even the proddings of the curious.[2] For a public official to do less would justify the suspicions of his critics.

The "era of openness" seems a recent manifestation of the public will. It is not surprising that prosecution for obstruction of justice — the coverup crime — has become prevalent, if not fashionable, in these serious seventies. It is a crime that breeds on fear, and as such finds fertile fields among those dependent upon the public weal. It is central among the crimes with which Samuel A. Green, Jr., State's Attorney for Baltimore County, was charged in a sixteen count indictment and convicted by a jury in the Circuit Court for Baltimore County.

The indictment arose peripherally from an investigation of "allegations of corruption of public officials in connection with the arrest, prosecution and escape of one John Edward [Liddie] Jones." The Attorney General's office conducted the investigation by authority of a gubernatorial directive dated November 13, 1972 issued in accordance with Article V, § 3, of the Maryland Constitution.

The incident which appellant was attempting to obscure arose from the dismissal of gambling charges erroneously placed against the owner of an automobile service station, one Kneass Harrington. Properly indignant that his wrongful arrest would remain a matter of public record open to anyone's perusal (see Md. Code, Art. 76A, *supra*), Mr. Harrington sought some means of expungement. The Court of Appeals had not yet held that such authority lay in the trial courts, *John Doe v. Commdr., Wheaton Pol. Dept.*, 273 Md. 262, and Mr. Harrington's pleas to at least two attorneys fell upon deaf ears. They knew of no procedure to procure expungement even of an arrest record. Mr. Harrington was, however, later put in contact with an investigator for, and confidant of, Mr. Green, namely Louis W. Irvin, whom Mr.

---

2. "All public records shall be open for inspection by any person ........" Md. Code, Art. 76A, § 2; Enacted by the Ch. 698, Laws of 1970, and amended annually thereafter.

Harrington had known previously. At Mr. Irvin's suggestion, Mr. Harrington wrote Mr. Green requesting the expungement of his arrest record. When Mr. Irvin again contacted Mr. Harrington, it was to collect the $750 for "legal" services involving the expungement. The evidence revealed that at Mr. Green's suggestion the petition to expunge was prepared and effectuated by Deputy State's Attorney Stuart Hirsch, who after preparation obtained an accommodation signature from Stephen Miles, a friend and attorney outside the State's Attorney's office.

Some apprehension seems to have arisen in the State's Attorney's office when Mr. Harrington became aware and indignant that the FBI still maintained a record of his arrest; however, the real anxiety came with the Governor's order for an investigation of the Liddie Jones case, in the vortex of which was Deputy State's Attorney Hirsch. Although the initial Jones investigation was not focused on Mr. Green, the Governor's directive to the Attorney General contained the unsettling closing paragraph:

> "In the event your investigation of the above **discloses acts or conduct in other areas which** warrant further investigation, grand jury action or prosecution, you are hereby directed to pursue the same, and you and the members of your staff designated by you shall have all of the same powers with respect thereto that have been conferred by me as to the above."

That mandate, and the discontented rumblings of Mr. Harrington, supplemented perhaps by questionable authority to expunge at all (prior to *John Doe, supra*), awakened Mr. Green to the precariousness of his own position, inevitably to be subjected to the harsh light of investigation. Through Mr. Hirsch, he first attempted to have Stephen Miles create a Harrington file, nunc pro tunc. Failing this he had his deputy solicit his (Hirsch's) father, also a lawyer, to provide an alternative cover.

What Mr. Green did not know, but came to suspect, was that Mr. Hirsch was cooperating completely with the

investigators. He had become disenchanted with Mr. Green, at one time his idol, and admitted having developed a deep-seated resentment toward him. Beyond that, although offered no immunity, his cooperation would not go unnoticed in regard to his own investigation.

As rumors increased, so too did Mr. Green's trepidation. The $750.00 cash payment by Mr. Harrington to Mr. Irvin was returned in like kind with an admission by Mr. Irvin that Mr. Harrington owed Mr. Green an expression of gratitude for his generosity. Unknown to the participants, this act was performed under police surveillance.

When Mr. Hirsch's investigatory involvement became more apparent, his denials of police participation to Messrs. Green and Irvin were met with threats of bodily harm and even death upon the confirmation of those suspicions. The threats were not made good either when Louis Irvin was indicted, tried and convicted, see *Irvin v. State*, 23 Md. App. 457, or when Mr. Green was indicted and tried in the Circuit Court for Baltimore County. He was convicted by a jury of misconduct in office, obstruction of justice, conspiracy and attempted subornation of perjury.

The crux of Mr. Green's crime was his effort to hide his office's involvement in the Harrington arrest record expungement at a time when investigatory bodies were scrutinizing the activities of that office under a broad gubernatorial mandate. It was not necessary to prove that Mr. Green had profited by the expungement, nor even that an attempt to obtain expungement was or would have been a crime (see *John Doe, supra*). By his wrongful attempts to mutate information sought by and for the grand jury, the crimes were complete:

> "The nature of the proceedings in which the witness [in this case, Mr. Hirsch] is to testify is immaterial on the question of the criminal character of acts designed to influence the testimony of a witness. . . ." F. Wharton, *Criminal Law and Procedure* (Anderson ed.) § 1281 at 629.

Had the information sought been the Sermon on the Mount, its deliberate mutation would nonetheless have been a crime.

## The Appeal

Appellant raises ten questions alleging error. The answers for the most part are of a factual rather than legal nature which became obvious after a review of the four thousand page transcript. Explaining the answers in context accounts for the length to which we must go in responding. For that reason related questions are treated together in an effort to curb our own verbosity.

## I.

"Did the Court err in denying Appellant's Motion to Compel Election as to Counts of the Indictment and permitting the jury to hear both the conspiracy concept charges and evidence of alleged substantive offenses simultaneously?"

After reciting Md. Rule 735 to show that the court below *could* have ordered "an election or separate trials of counts," appellant then quotes *Wanzer v. State*, 202 Md. 601 to indicate that the court *should* have, subject only to the "limitation ... that Courts will guard against injustice." Recognizing the improbability of success in appellate efforts to prove abuse of judicial discretion, appellant takes the more rigid view that he has a *right* to a trial of the substantive crimes, separate from a charge of conspiracy to commit those crimes. His argument seems to rely almost entirely upon a single sentence quoted from *Wilson, Valentine and Nutter v. State*, 8 Md. App. 653, 666, *cert. denied*, 258 Md. 731:

"If the State chooses to prosecute an individual conspirator for a substantive crime, he is entitled to a separate trial on that substantive crime on demand, even though the substantive crime constitutes an overt act tending to establish the conspiracy."

Appellant is not the first to utilize that language to assert such right, *Mason, Taylor & Taylor v. State,* 18 Md. App. 130, *cert. denied,* 269 Md. 763, 767; 416 U. S. 907. There we said, as here we repeat:

"Unfortunately for the appellant[s'] position, however, the quotation is lifted out of context."

In *Valentine* the Court was facing joinder of defendants, as well as joinder of multiple counts and indictments. Some were related, some were not, although all of the defendants had been charged with a single conspiracy. In context, it is clear that the Court intended that the separate trial to which a conspirator had a right for substantive crimes, was restricted to those substantive crimes which the defendant had *not* conspired to commit. It would be foolhardy and purposeless to require as of right two trials — one for a crime committed and one for a conspiracy to commit the same crime.

The prejudice appellant infers from joinder is based upon his belief that, had a severance been granted, he could have precluded the admission of a statement made to police officers by Louis Irvin since that statement, he contends, would not have been admissible except as "acts occurring during a continuing conspiracy." *Greenwald v. State,* 221 Md. 245, 250. We note, however, that *Greenwald* at 254 itself refutes the very foundation of his prejudice argument:

"It has been held that even though the indictment charges a substantive crime on a specified date but the proof shows that there was, in fact, a conspiracy to commit the substantive crime, the acts and declarations of one conspirator are admissible against the other, and the rules of evidence are the same as where conspiracy is expressly charged. 22 C. J. S. *Criminal Law,* Sec. 756b. The court so held in *People v. Novotny* (Ill.), 20 N.E.2d 34, 35. There the indictment charged Novotny with maliciously damaging a building on September 8, 1937. The court said: 'When, however,

the crime charged has been committed in pursuance of a conspiracy, even though the indictment does not charge conspiracy, it is competent to show that the crime committed was the result of a conspiracy and every act of the conspirators is admissible, even though the commission of other crimes is disclosed.' See also *Commonwealth v. Hancock* (Super. Ct. Pa.), 112 A. 2d 407, 410, where the charge was of a substantive crime and the court held that since the defendants had been shown to have had a common intent, plan and design, the declarations of Miller, one conspirator, were admissible against the appellee Hancock. The opinion relied on *Commonwealth v. Sheaffer* (Super. Ct. Pa.), 23 A. 2d 215, 217, in which various authorities to the same effect are set forth at some length. See also *Coplin v. United States*, (9th Cir.), 88 F. 2d 652, *cert. den.*, 301 U. S. 703, 81 L. Ed. 1357; *State v. Tennyson* (Minn.), 2 N. W.2d 833, 837.

This Court has indicated agreement with the other Courts to which we have referred."

## II.

"Did the Court err in admitting a typewritten copy of an alleged 'corrected' statement of Louis Irvin, an alleged co-conspirator, and did not require instead the playing of a tape recorded version of said statement, which was the 'best evidence' in the case?" [3]

The typewritten statement of the co-conspirator, Louis Irvin, which was originally taken on a tape recording by the State Police, was introduced over appellant's objection.[4] In

---

[3]. Appellant inaccurately employs the term "best evidence" which, in its classic application, treats only documentary evidence. Andresen v. State, 24 Md. App. 128, 203-205.

[4]. Although appellant's brief argues only the admissibility of the typed statement as in derogation of the best evidence rule it is questionable at

*McGuire v. State,* 200 Md. 601, 606, the Court of Appeals assumed that a recording tape would have been the best evidence of certain conversations; thus, reasons appellant, he was entitled to the best. Beyond that, he points to prejudice in the jury's inability to weigh voice inflection and intonation in determining the meaning of the statement. It is not contended upon this appeal that the transcripts are inaccurate or that the conversations which were recorded did not take place. See also *Raimondi v. State,* 265 Md. 229, 230, *cert. denied,* 409 U. S. 948.

In *Forrester v. State,* 224 Md. 337, tapes were acknowledged as the best evidence of a conversation and as such were permitted introduction over appellant's objection. The Court succinctly construed the rule to be applied:

> "The best evidence of which the case is capable must be produced, and secondary, or inferior evidence is only admissible after a proper foundation has been laid, showing good and sufficient reasons for the failure to produce the primary evidence."

Such foundation was laid and sufficient reasoning was produced for the substitution of the original tape. The State showed:

1. The transcription had been carefully prepared,

---

best whether or not he preserved that ground of objection at trial. The court called upon him to state the ground, Md. Rule 522 d, saying:

> "THE COURT: Well, are you suggesting that this typewritten transcript is inadmissible because it is not the best evidence or are you merely saying that if other things being equal, if this is what Sergeant Travers says the tape says, that's fine, but we have the tape and it says something else?
>
> MR. WHITE: I think I am taking the latter course.
>
> THE COURT: So that we are not down to the fine legal issue of whether or not this transcript gets in as Sergeant Travers' testimony as to what the tape says, you are just reserving the right, in effect, to dispute that this is an accurate transcript —
>
> MR. WHITE: Yes, Your Honor.
>
> THE COURT: — of the tape?
>
> MR. WHITE: Yes, Your Honor."

We have, however, elected to meet the best evidence argument presented.

reviewed and corrected by a State Police Lieutenant and proffered the transcript as "a more understandable form than the tape would be. The tape is kind of fast in parts and slow at parts."

2. The original tape was evidence in the *Irvin* case, *supra*, then on appeal to this Court and even now pending on certiorari before the Court of Appeals. Although it could be removed by court order little purpose would be served by so doing.

3. A copy of that tape had been made and given to appellant. Recording equipment was available even at trial for his use and he was free to use it for checking accuracy, cross-examination, introduction on his own behalf or any other purpose which was the basis of his original objection.

We think this meets the test of *Forrester* although the practice followed in *Raimondi* of introducing both tape and transcripts for clarity and comparison is certainly preferable. The dilemma here, however, was whether to have the original tape remain with the Irvin case on appeal or introduce it at Mr. Green's trial. Even a copy of the original tape would have been subject to a "best evidence" objection. Finally, although prejudice was speculatively alleged regarding voice intonations, there was no evidence thereof produced. If it were within appellant's awareness he has not brought it within ours. Had it been so at trial he was free to overcome it with the duplicate tape given him by the State. No reason has been shown why Mr. Irvin's appeal should have been jeopardized by removing evidence more crucial in its original state there than here.

We see no prejudice, we find no error.

### III.

"Did the Court err in permitting the State to exploit the subject of Appellant's alleged 'sexual

misconduct' despite a pretrial limiting order requested by the State that such testimony would not be admissible?

## IV.

Did the Court err in denying Appellant's Motion that the State be precluded from cross examining him on 'marital infidelity' and 'sexual misconduct' in the event Appellant chose to take the stand in his own defense and testify fully concerning the allegations set forth in the Indictment?

## V.

Was the Appellant afforded a full and complete opportunity to exercise his Fifth Amendment rights in making an intelligent election as to whether to testify in his own defense in light of the Court's ruling that he could be cross examined on collateral, highly prejudicial matters of alleged 'sexual misconduct'?

## VI.

Did the Trial Judge err in denying Appellant's Motion for Mistrial after all evidence was in and State announced its intention to argue 'sexual misconduct' as a possible motive for the commission of the crime, after the State had assured the Court for weeks that its only theory of admissibility of said testimony was the bolstering of the credibility of their main witness, Stuart Hirsch?

## VII.

Did the Trial Judge err in ruling that the State could produce rebuttal testimony on the subject of alleged 'sexual misconduct' even though the Appellant produced no testimony which would have permitted such rebuttal?"

That the emphasis given appellant's sexual conduct was given by appellant himself is not only apparent from his brief, half of which is concerned therewith, but also from our careful reading of the twenty-two volumes of testimony. With but little exception, its relevance seems highly questionable in an obstruction of justice case. However, because appellant became inordinately preoccupied with the subject, a chain of relevancy for subsequent testimony was knitted link by slender link. All of the sexual conduct evidence was expressly and continually eschewed by the trial judge, but finally permitted at appellant's instance.

Anticipating the emergence of that subject matter by reason of pretrial publicity, Judge Ross carefully advised counsel even before the jury was empanelled, to instruct their witnesses not to volunteer any information covering marital infidelity except in response to a direct and specific question. He admonished counsel themselves that "you may not mention marital infidelity in your opening statement or ask any questions concerning marital infidelity until you have persuaded me that there is some basis in fact for use of that to show or to impeach the witness at the trial other than on the ground that such misconduct is discrediting."

On the morning of the fifth day of the month long trial, Stuart Hirsch, the State's key witness, was testifying to a visit in company with appellant to the office of a State Senator. Appellant had accused Mr. Hirsch of cooperating with the investigators and wanted to confront his denials with appellant's source of information. The Senator had presumably heard accusations made by Hirsch to the State Police. Hirsch testified that appellant drove him to Annapolis to face his accuser:

> "Mr. Green drove. It was his car. I asked him if we were going to see Senator Pine. I said, 'What is in the statement that I was supposed to have given?' He answered that I paid two thousand dollars for my deputy job, plus agreed to allow Mr. Green to use my apartment for sexual purposes. . . ."

No objection was made to this testimony by appellant.

After a brief dialogue between the witness and State's Attorney, the State then pursued the question to ascertain whether the accusation attributed to Hirsch was true, to which appellant entered his first objection and, upon reflection, withdrew even that.

> "Q. Was the statement attributed to you by Senator Pine, in fact, true, sir?
> MR. WHITE: Your Honor, I object. Well that's all right, I withdraw the objection. Go ahead.

* * *

> A. That was not completely accurate, no, sir. . . .
> I paid Mr. Green one thousand dollars and agreed to let him use my apartment."

If it was not then apparent that appellant made a tactical decision to seize upon the answer as opening a whole new vista to him, it became obvious as the trial progressed. Not only did appellant decline any corrective action in the nature of a motion to strike or an offered clarifying instruction when he later broached the subject out of the jury's hearing, but he pressed for and finally received the right to cross-examine Hirsch extensively upon all aspects of his out-of-court accusations of Mr. Green's sexual predelictions, peccadilloes, peculiarities and even "perversions." Like the King of Epirus, however, appellant had gained a victory at too great a loss.[5]

The principle of admissibility argued was that Mr. Hirsch's credibility was crucial and subject to attack. Appellant attempted to discredit Mr. Hirsch by exposing what he viewed as inherently unbelievable out-of-court statements publicly and privately made regarding this phase of Mr. Green's life. The questions he asked were exhaustively detailed and explored every episode. He hoped to reveal the viciousness of Mr. Hirsch's attacks by demonstrating the absurdity of the extremes to which he

---

5. Pyrrhus, King of Epirus, after the battle of Asculum in Apulia in 279 B.C., is purported to have exclaimed "One more such victory and we are lost," hence the term, Pyrrhic Victory.

would go. His technique was a form of impeachment by showing bias or, as Professor Wigmore phrases it, by "indicating [the witness's] disposition or habit or *general scheme to make false charges or claims*." 3 Wigmore, Evidence (3d ed.) § 963 at 520.

The cross-examination regarded accusations by Hirsch which ran the sexual gamut from long affairs to short affairs, local and interstate. It included Hirsch's accusations of appellant's predelictions toward peculiar sexual activities which deviated not only from the conventional, but also from the peculiar, entailing the use of condiments and dessert toppings, if Hirsch was to be believed.

Suffice to say the attack on Hirsch's credibility was not necessarily for naught. Ridicule can be devastating and the more so when the ridiculous is admitted.

The State thereupon faced substantial diminution of the credibility of its sole witness, with whom its case would stand or fall. The jury could well have seen Mr. Hirsch as an emotionally unstable man (he had admitted himself to a mental hospital) heaping expressions of vituperation on an employer he now resented, and concluded that his sexual accusations of appellant, a family man, were preposterous. The State had but one course to follow if it hoped to prevail and that was to bolster the faltering witness. It elected to do so by proving the probability of those seemingly preposterous sexual exploits.

Mr. Hirsch had testified on cross-examination that he had accused Mr. Green of giving a paramour a color T.V., only to repossess and sell it to another deputy at a profit, after a parting of the ways. He admitted to repeating an obscenely rhymed verse setting forth what was expected of secretarial applicants, which verse and office standards he attributed to Mr. Green. In addition to the use of his own apartment by Mr. Green for sexual cavorting, he admitted that he spoke of other clandestine rendezvous such as rooms at vacation resorts during conventions, retained by others but used by Mr. Green.

In the long journey toward rehabilitation the State

traveled three paths. First, on redirect examination the State asked Mr. Hirsch to name names, times and places for the events described. The State then established the sources upon which Mr. Hirsch relied for the out-of-court stories he admitted having told. These sources included braggadocio by Mr. Green, personal observations of criminatory circumstances, and conversations with Mr. Green's participants.

The second step toward instituting respectability for Mr. Hirsch was the production of corroborative witnesses during rebuttal. The State called the man whom Hirsch had named as retaining a room at Ocean City used by appellant and a female friend. Then the State produced the female friend. Subsequently, it produced the color T.V. merchandiser and an office secretary and recipient of the color T.V., to substantiate the story of appellant's aborted affaire de coeur.

The third recuperative effort was the State's reply to appellant's motion in limine, which asked that the State be precluded from cross-examining appellant regarding sexual misconduct, in the event he chose to take the stand. The short answer to appellant's assertion that the court's denial was error (Question IV) lay in the denial itself and its accompanying explanation. Although the court lamented the insertion of sex from the beginning, it decided that since appellant had used it to attack Mr. Hirsch's credibility "it has become an issue in the case through the history we have discussed, and it is now relevant in respect to Hirsch's credibility, . . . to the extent that it has been opened in that area. . . ." He continued by explaining "that the only area [the State] could go into on that, on the sex basis . . . is where it relates to Hirsch's testimony."

In declining to grant the motion in limine absolutely, the court stated that it would have to rule on the propriety of each question asked. That ruling clearly was not error. Because appellant belatedly weighed the potential consequences when he declined to testify, he can hardly cry foul, having himself charted the course he was later compelled to pursue.

During this unlikely transformation of the subject of **sexual activities from one of questionable relevance** [5A] to an issue of Hirsch's credibility, a single, controlling observation emerges. Having fashioned that subject into a defensive sword of indignation, appellant may not seek sanctuary when the State converts it into an offensive weapon.

Nor, having once so insistently demanded that the subject be explored, can appellant now object to the State's suggestion in closing argument that an additional motive underlying appellant's attempt to obstruct the investigation was a desire to hide that which he had himself now so vividly exposed. Anticipating that theory by the State in closing argument, appellant moved for a mistrial, presumably because the State acknowledged its intention to

---

**5A.** The relevance of the State's rehabilitative effort had been created by appellant's extended attempt to demonstrate Mr. Hirsch's vindictiveness:

> " 'When cross-examining counsel see fit to call out from the witness collateral facts which tend to create distrust of his integrity, fidelity, or truth, it is entirely competent for the adverse party to ask of the witness an explanation which may show that the facts thus elicited were in truth wholly consistent with his integrity, fidelity, and truth, although they thereby prove circumstances foreign to the principal issue, and which, but for such previous cross-examination, they would not be permitted to prove.' " *U. S. v. 18 Barrels,* 8 Blatchf. 478 (1871) cited in 3 Wigmore, *Evidence* (3d ed.) § 952 at 511.

In addition to the attack on Mr. Hirsch's credibility during cross-examination, appellant called a virtual parade of witnesses whose testimony was relevant solely for impeachment purposes. In those circumstances, the trial court's decision to allow the State to introduce extrinsic evidence in rebuttal to rehabilitate the witness was clearly not an abuse of discretion.

> "Impeachment is not a dispassionate study of the capacities and character of the witness, but is regarded in our tradition as an *attack* upon his credibility. Under our adversary system of trials the opponent must be given an opportunity to meet this attack by evidence sustaining or rehabilitating the witness. One general principle is that in the absence of an attack upon credibility no sustaining evidence is allowed. A second truism is that when there has been evidence of impeaching facts the proponent may bring contradictory evidence asserting the untruth of the alleged impeaching facts. Such a denial is always relevant and allowable.
>
> . . . The rehabilitating facts must meet a particular method of impeachment with relative directness. The wall, attacked at one point, may not be fortified at another and distinct point." C. McCormick, *Evidence* (2d ed.) § 49 at 102-103.

so comment. At the time of the motion, however, there was nothing before the judge upon which he could rule. With his usual abundance of caution Judge Ross expressly permitted appellant to reopen his case if he so desired. He declined the opportunity.

We note further that this use of sexual misconduct as a motivation for cover-up was not the surprise at the end of the case appellant claimed it to be. Even before the jury was empanelled, the court admonished the litigants — and especially appellant — to steer clear of sexual misconduct during the trial. He used motivation as an example saying

> "Now, I have picked motivation because that seemed to be the most likely use of it. . . ."

Appellant's position is as anomalous on the "surprise" issue as it is on the preceding arguments.

We have thus responded to appellant adversely in all his claims of error regarding the use of sexual misconduct during trial. It would serve no purpose to restate the questions and respond seriatim when our determination is so clear. We move on then to Question VIII.

### VIII.

> "Did the Court err in denying Appellant's Motion for Judgment of Acquittal and permitting the jury to deliberate on all sixteen counts of the Indictment despite the State's admission that the charges were factually the same and were basically set forth under different theories?"

We are somewhat nonplussed by the issue which seems to fuse a question of sufficiency of the evidence with an assertion that the State was compelled to elect. We will touch upon both to assure ourselves we have not misunderstood appellant.

Regarding the sufficiency of the evidence, suffice to say we have carefully read all of the transcribed testimony, perused the evidence, the record and the voluminous investigatory matter submitted *in camera* as possibly

containing exculpatory material under *Brady v. Maryland*, 373 U. S. 83 and *Giles v. Maryland*, 386 U. S. 66. The admissible evidence we reviewed was ample in law to sustain a conviction of misconduct in office, obstruction of justice, attempted subornation of perjury and conspiracy. The State proved that appellant conspired with the prosecuting witness and another to mislead investigators, obscure facts and change testimony.

If not sufficiency, appellant apparently argues his motion for judgment of acquittal should have been granted because the State was required to elect counts, relying on Md. Rule 735, which provides that the court " . . . may order an election or separate trials of counts . . . or provide such other relief justice requires." We have treated the question of separate trials of counts in appellant's first question. We now respond to the court's authority to order an election.

In *Baumgartner v. State*, 21 Md. App. 251, 253 the appellant contended that it is never proper to permit the joinder of offenses under Md. Rule 716 a "unless all of the offenses involve substantially the same facts, form part of the same transaction, and occur during a brief space of time." Appellant here approaches the joinder question inversely, arguing that because the offenses joined in the indictment involved the same facts, formed a part of the same transaction and occurred within the same time span, the State should have been compelled to elect those upon which it chose to rely. The indictment contained sixteen counts, some charging the same crime in different ways, *e.g.*, statutory and common law, all based upon the same transaction.

Appellant contends that the court may require the State to elect and it "should be done at the instance of the accused and that the trial judge has the duty to see that the charges are actually distinct," citing *Toomer v. State*, 112 Md. 285. We do not read *Toomer* thus. Indeed we read it precisely oppositely.

After recognizing that

"It is the common and approved practice in this

State to insert in the indictment several counts, charging the offense in different ways, and to charge in one indictment, in separate counts, two or more felonies growing out of the same transaction,"

the Court of Appeals said:

"[W]here there are several counts in the indictment, charging *separate and distinct offenses*, the Court may, in its discretion, require the prosecution to elect upon which count he will proceed, or quash the indictment. That should not be done, however, at the instance of the accused, unless the Court can see that 'the charges are actually distinct and may confound the prisoner, or distract the attention of the jury.' But the indictment will not be quashed, where it is obvious on its face, 'that the several counts related to the same transaction, and that the variation of the form in which the offense is charged in the different counts is done with a view to meet the evidence.' " *id.* at 289-290. [Emphasis added].

The case relied upon by appellant is thus dispositive of his own issue. His further reliance upon *Simmons v. State*, 165 Md. 155 is totally misplaced unless he is asserting misjoinder or duplicity as was alleged in the *Simmons'* indictment. Judge Ross succinctly responded to that contention:

"With respect to the duplicity or duplicitousness which has been mentioned on several occasions, we fall into the area where the word is used grammatically correctly, but the legal significance of duplicity is not twice stating the crime into counts, but in stating two crimes in one count. I think that is one thing that this indictment clearly avoids, so that there is no duplicity in the legal sense, nor is there any duplicitous count in that legal sense."

If on the other hand appellant cites *Simmons* solely for the general propositions he quotes therefrom, we say only that Judge Ross did not abuse his discretion:

> "The matter of a misjoinder is generally left to the discretion of a trial court and the courts will guard against injustice and abuse wherever apparent and not permit such a joinder of counts as will embarrass the traverser in his defense by, in the Court's sound discretion, quashing the indictment, permitting a nol prosse as to a count or counts or compelling the prosecution to elect upon which count or counts to proceed."

### IX.

> "Did the Trial Judge err in declining to require the State to furnish various data and transcripts to Appellant under the holdings of 'Brady' and 'Giles' and also when such documents and reports were utilized by the State's witnesses in direct testimony?"

In preliminary motions appellant requested "any exculpatory information" which would come within the ambit of *Brady, supra,* 373 U. S. 83, or *Giles, supra,* 386 U. S. 66. Appellant was asserting a right grounded in the due process clause of the Fourteenth Amendment, succinctly outlined in *Brady,* 373 U. S. at 87:

> "We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or the bad faith of the prosecution."

*Moore v. Illinois,* 408 U. S. 786, set forth three factors which must coalesce to effect the *Brady* sanction:

> "(a) suppression by the prosecution after a request by the defense,

(b) the evidence's favorable character for the defense, and

(c) the materiality of the evidence."

## Giles

*Giles*, which followed *Brady*, added far less to clarifying *Brady* than that with which it is generally credited. Under the circumstances here, *Giles* is totally inapposite. Mr. Justice Brennan, writing for the majority in *Giles* found it "unnecessary and therefore inappropriate, to examine . . . the broad questions whether the prosecutor's constitutional duty to disclose extends to all evidence admissible and useful to the defense, and the degree of prejudice which must be shown to make necessary a new trial." The Court decided that because "We now have evidence before us, which neither Judge Moorman nor the Court of Appeals considered, which in our view justifies a remand . . .", the case would be returned to the Maryland Courts to decide whether the concept of *Napue v. Illinois*, 360 U. S. 264 had been abused. *Napue*, and thus *Giles*, was restricted to the prosecutor who, "although not soliciting false evidence, allows it to go uncorrected when it appears." *Giles*, 386 U. S. at 74 quoting *Napue*, 360 U. S. at 269. It would be difficult to conceive of a *Giles-Napue* issue arising on direct appeal as opposed to post-conviction relief, Md. Code, Art. 27, § 645A, unless raised on a Motion for New Trial for Newly Discovered Evidence. In the case sub judice there is no contention of exculpatory evidence coming to a prosecutor who "allows it to go uncorrected when it appears."

## Brady

In the court below reams of investigatory material, statements of witnesses, etc. were brought into the court by the State at appellant's request. The information emanated from an allegedly on-going investigation into corruption in Baltimore County. The court adopted a practice encouraged by the State and prevalent in the federal courts of reviewing the evidence for possible exculpatory material. The State presumably preferred to relieve itself of the consequences of

its own misjudgment, which might on the one hand jeopardize this case by inadequate disclosure, or on the other jeopardize its continuing investigation by too much disclosure. Worse yet, the information could have been damaging to innocent persons mentioned in the investigatory records. The court below reviewed the material — as have we — but as an exceptional practice rather than as a general policy.

Nor should *Brady* or *Giles* be interpreted as a mandating *in camera* review. These cases do nothing more than provide the consequences for suppression of exculpatory evidence. They do not provide a constitutional device permitting appellant to cast his net upon the evidentiary waters, nor do they extend our rules of discovery to such broad, net-like fishing expeditions. Since appellant recites instances, however, we will examine each against *Brady* standards and respond thereto:

> 1. "Appellant's counsel asked for . . . three or four pretrial statements of Mr. Harrington to determine if there was any exculpatory information by way of impeachment contained by comparing the various statements."

Appellant has not established that the suppressed material was favorable, and the very phrasing of the issue evidences that he desired only to rummage for something helpful on cross-examination. Beyond that, we have held in *Younie v. State*, 19 Md. App. 439, 460, rev'd on other grounds, 272 Md. 233, that "when the allegedly suppressed evidence is not evidence which goes directly to the question of guilt but simply to the impeachment of a State's witness, the broad consensus of legal thinking is that far more will be required to establish materiality." See also *Link v. United States*, 352 F. 2d 207, *cert. den.*, 383 U. S. 915 (8th Cir.).

> 2. Appellant contends that the court "erred in the same manner . . . as to the so-called 'Liddy Jones Report.' "

That report was a compilation or summary, prepared by a

prosecutor during a former prosecutorial job, of conversations with a bail bondsman named Fred Frank who had allegedly been solicited for a bribe by the prosecuting witness. Frank had twice testified on the issue in another case. That testimony and Frank himself were equally available to appellant. We note that this report was part of the evidence reviewed by Judge Ross and independently appraised by this Court. We agree in retrospect with Judge Ross's prospective finding that this is not *Brady* material.

The appellant next assigns error in not having received:

3. "anything in the State's file, either in the form of a police report or a memo to the file from the Attorney General's Office or a member of the staff thereof, relating to [a 5 day stay in a mental hospital by witness Stuart Hirsch] or any of the particulars which had been made known to agents of the State some eight or nine months prior to the trial of the case." [6]

Upon his examination as a witness, Hirsch asserted his psychiatric communication privilege under Courts Art., § 9-109, with respect to details of his hospitalization. We note that appellant did not suggest the possibility of conflict between his due process-*Brady* right and the witness's statutory privilege. *Vuitch v. State*, 10 Md. App. 389,

---

6. Based on this request, the State furnished the defense, before trial, the following information:

"With respect to the matter of psychiatric conditions, last Thursday or Friday I learned in a telephone conversation with Mr. Hirsch, for the first time, that in the spring of 1973 he consulted with a Dr. Quattlebaum in Kensington, Maryland, and that thereafter, he admitted himself for, I believe, a five-day period to the Psychiatric Ward of the George Washington University Hospital in D. C. He told me that he was admitted because he was terribly depressed, because his boss, Mr. Green, had been threatening him, and because he was acting as a double agent in the on-going Maryland State Police investigation. He, also, told me that Mr. Green was aware of the fact that he was hospitalized, and that they had telephone conversations while he was at the hospital when Mr. Green called him and he called Mr. Green, but, nonetheless, I do say that I first learned of that last Thursday, and I have no other information other than that. I have not received any documentary evidence of any kind."

397-398, *cert. denied,* 261 Md. 729, 404 U. S. 868. The details Mr. Hirsch refused to divulge regarding this hospitalization were clearly privileged. All information in the possession of the State was given to appellant prior to trial when asked therefor on discovery. What appellant now seems to ask is whether he received all information possessed by the State which would have been exculpatory. The information not given appellant was also reviewed *in camera* by Judge Ross and resealed for this Court's scrutiny. There was no exculpatory material revealed that was not privileged.

4. "Another breach of discoverable information not provided to Appellant centered around his [appellant's] Grand Jury testimony."

The absurdity of considering this as *Brady* material is self evident. The appellant even refers to it as discoverable rather than exculpatory. He has not alluded to any evidence in his Grand Jury testimony that was 1) material, 2) demonstrably favorable, and 3) that was not already known to him — three essential prerequisites to the successful invocation of the *Brady* doctrine. *Moore, supra,* 408 U. S. 786; *Younie, supra,* 19 Md. App. 439. Even under discovery rules it would fall within the discretionary category, see *Kardy v. Shook,* 237 Md. 524, 540, citing *Whittle v. Munshower,* 221 Md. 258, 261. In either case there was no error in not providing it to appellant.

5. The final complaint was over the alleged denial of a statement of a defense witness, however, we are at a loss to follow the contention since appellant concedes in his brief that the statement was produced for appellant's use at the trial.

\* \* \*

X.

"Did the Attorney General have the authority to bring about the Indictment in the instant case under the limited terms of the Governor's directives?"

Again we have serious reservations in responding because the portion of the record purportedly containing the preservation of the question is not before this Court. Since that responsibility lay with the appellant, *White v. State*, 8 Md. App. 51, *cert. denied*, 257 Md. 737, it would seem we would not be remiss in declining to respond to this question. *Rosenberg v. State*, 12 Md. App. 20, *cert. denied*, 263 Md. 719.

The simplicity of response urges us otherwise. The Governor's letter of authority to the Attorney General contains the Constitutional authority in paragraph one and the broader warrant in paragraph two. It answers appellant's inquiry, was in evidence and reads as follows in pertinent part:

> "Under the provisions of Article 5, Section 3, of the Maryland Constitution, I hereby direct you to investigate the allegations of corruption of public officials in connection with the arrest, pending prosecution and escape of one, John Edward Jones, from the Baltimore County jail, and to pursue any evidence of criminal violations or administrative irregularities resulting from your investigation. You are authorized to utilize whatever services of the Maryland State Police or other agencies of the State Government you may consider advisable. Furthermore, you and such members of your staff as you may designate may present to any Grand Jury of the State information so developed, and prosecute in any courts of the State such violations of the law as shall be disclosed by the aforesaid investigation.
>
> In the event your investigation of the above discloses acts or conduct in other areas which warrant further investigation, grand jury action or prosecution, you are hereby directed to pursue the same, and you and the members of your staff designated by you shall have all of the same powers with respect thereto that have been conferred by me as to the above."

## Epilogue

We have oft repeated that a defendant is entitled to a fair trial not a perfect one. *E.g., Boblits v. State,* 7 Md. App. 391, 400, *cert. denied,* 256 Md. 743. Many of the imperfections here were of appellant's own making having been tactical decisions made in the field under stress of battle. In light of the alternative options open at the time, even in retrospect we cannot say they were wrong, only that they did not succeed. But the trial itself was fairly conducted, eminently so. Judge Ross's decisions throughout were not only proper, they were just.

Whether appellant would have been tried and convicted had he been less prominent is a question upon which he asks us to speculate, "But verdicts cannot be upset by speculation or inquiry into such matters." *Dunn v. United States,* 284 U. S. 390. It would be ostrich-like for us to say that possibility does not exist however, when the Supreme Court has acknowledged it in the field of defamation. The language used has special significance in light of appellant's question:

"An individual who decides to seek government office must accept certain necessary consequences of that involvement in public affairs. He runs the risk of closer public scrutiny than might otherwise be the case. And society's interest in the officers of government is not strictly limited to the formal discharge of official duties. As the Court pointed out in *Garrison v. Louisiana,* 379 U. S. 64, 77, the public's interest extends to 'anything that might touch on an official's fitness for office . . . Few personal attributes are more germane to fitness than dishonesty, malfeasance, or improper motivation, even though those characteristics may also affect the official's private character.'" *Cf., Gertz v. Welch,* 418 U. S. 323, 41 L.Ed.2d 789, 808.

*Judgments affirmed.*
*Costs to be paid by appellant.*