859 A.2d 285

**STATE of Maryland**

v.

**Yerson Rafael CABRAL.**

**No. 261, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

Oct. 6, 2004.

356

Steven L. Holcomb (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellant.

Todd E. Carroll (William F. Riddle, on the brief), Elkton, for appellee.

Panel: HOLLANDER, JAMES R. EYLER and SHARER, JJ.

HOLLANDER, Judge.

This expedited appeal has been brought by the State pursuant to Maryland Code (1974, 2002 Repl. Vol., 2003 Supp.), § 12–302(c)(3)(i) of the Courts & Judicial Proceedings Article ("C.J.").[1] The State challenges the order of the Circuit Court for Cecil County, suppressing contraband and over $175,000 recovered during a warrantless search of a vehicle driven by Yerson Rafael Cabral, appellee. The search was conducted during a traffic stop, after a trained canine alerted to the presence of drugs in the vehicle.

The State asks one question:

---

1. Pursuant to C.J. § 13–302(c)(3)(iii), we are required to render our decision within 120 days of the filing of the record in this Court. As the record was filed on May 21, 2004, our ruling had to be rendered by September 20, 2004. Accordingly, on September 9, 2004, we filed an order reversing the circuit court. This opinion follows.

Did the motions court err by granting the motion to suppress because the alert by the trained and certified drug dog in this case provided probable cause to conduct a warrantless search of Cabral's vehicle?

The primary issue posed by the State requires us to consider whether probable cause to search a vehicle is undermined because of "the possibility that a drug dog could alert on residual odor. . . ." While challenging probable cause, appellee contends that the circuit court properly granted the suppression motion because the State did not satisfy the best evidence rule; it was unable to play for the court the trooper's digital recording of the traffic stop.

For the reasons set forth below, we shall reverse and remand.

## FACTUAL SUMMARY

Cabral was charged with possession of heroin with the intent to distribute, and with following "another vehicle too closely. . . ." Thereafter, he moved to suppress the evidence seized from his vehicle during a warrantless search. An evidentiary hearing was held on February 20, 2004, and on March 17, 2004. A summary of what transpired at the hearings now follows.

On August 28, 2003, Trooper First Class Christopher Spinner was assigned to the Interstate Criminal Enforcement Team. Between 2:45 p.m. and 3:00 p.m. on that date, he effected a traffic stop of a Mercury Villager minivan on Interstate 95 in Cecil County, because it was following another vehicle too closely. Appellee was the driver of the vehicle and he was accompanied by one passenger.

Trooper Spinner testified that he "advised" Cabral of "the reason for the stop." Upon request, Cabral produced his driver's license and vehicle registration, which revealed that "the vehicle was registered to a third party." Spinner "noticed that [Cabral] was breathing very heavily and his chest was rising and falling quickly and his hands were shaking as he gave [Spinner] his driver's license and registration." Spin-

ner recalled "some other interesting things." He noted that "there was a single key in the ignition, no other keys on the key ring, and there were some pump air fresheners throughout the vehicle as well as a strong odor of air freshener coming from the vehicle."

After Cabral produced his driver's license, Spinner "[a]sked him to remain in the vehicle while [he] went back and prepared the paperwork." Spinner also called for assistance. Shortly thereafter, Troopers Catalano and Connor responded to the location, arriving at "just about the same time." [2] At that point, Spinner "was beginning to fill out the paperwork necessary for the warning as well as calling in the license and registration checks." Spinner added that, when Trooper Catalano arrived, he (Spinner) "was still waiting on the checks and attempting to complete all the paperwork."

Spinner "advised" Catalano of his "initial observations." As Spinner continued to work "on the warning," and while "waiting on the checks," Connor spoke to the driver and Catalano "conducted a K–9 scan of the van. . . ." The K–9 scan of the vehicle "result[ed] in a positive K–9 alert." In his testimony, Spinner made clear that, when the dog alerted, he "was still working on the warning" and had not yet finished the "license and registration check." The following colloquy is pertinent:

[PROSECUTOR]: And as far as the license and registration check that you were conducting, is that the standard operating procedure in making a traffic stop on Interstate 95?

[TROOPER SPINNER]: Yes, it is.

* * *

[PROSECUTOR]: Okay. . . . You hadn't received the results of that [license and registration] check at the time that the dog alerted?

[TROOPER SPINNER]: No, I had not.

---

2. Neither Spinner, Catalano, nor Connor testified to the time of their arrival.

Based upon the alert, Spinner and Connor searched the vehicle, while Catalano remained with the driver and the passenger "for their safety and ours. . . ." During the search of the vehicle, the troopers spotted "a hidden compartment in the driver's side panel of the vehicle," from which they recovered $178,840 in United States currency and "three compressed pellets" of heroin.

On cross-examination, Trooper Spinner testified that he had a DVD camera in his patrol car, which he activated during the stop.[3] However, he did not have the DVD with him at the February 2004 hearing. Although Spinner offered to retrieve the DVD from his vehicle, the State did not have the equipment needed to play it.

State Trooper First Class Joseph Catalano testified that he was assigned to the Maryland State Police Special Operations Section, K–9 Division. He had been a K–9 handler for approximately one year prior to the date in question. According to Catalano, his dog, Bruno, was trained to detect the odor of various Schedule II illegal drugs, including heroin, cocaine, and marijuana. Moreover, Bruno was up-to-date on the requisite retraining and certifications, and had been successful in the field in the year prior to the stop. Accordingly, the State offered Bruno as an "expert in detection of controlled dangerous substances."[4] Defense counsel objected, and was permitted to conduct voir dire.

---

3. "DVD" refers to "digital video disk." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (2003), at 389. "Digital Video Disk" is defined as "an optical disk using such a format and containing esp. a video recording (as a movie) or computer data." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (2003), at 389.

4. We refer to the following colloquy:
> [PROSECUTOR]: Your Honor, I would offer Bruno as an expert in detection of controlled dangerous substances.
> [APPELLEE'S COUNSEL]: I'm going to object, Your Honor, unless I can do some voir dire in regards to the training.
> THE COURT: Go right ahead.

Later, in its ruling granting the suppression motion, the court rejected Bruno and his handler as experts.

During voir dire, Catalano testified that in 2002 he and Bruno "initially went through an 11–week course" and, at the end of that course, Bruno was certified. Moreover, Bruno was recertified in November 2003. In addition, Catalano explained that they "go through a 24–hour of monthly training and then an [sic] every quarter we go through, like, a certification training." Catalano claimed that Bruno is unable to detect prescription drugs, such as Codeine, Oxycontin, or Oxycodone.

Catalano explained that Bruno alerts by "paw[ing] at the direct odor of the source [sic]. That's one of his behavior changes. Then it's followed by he sits. That's his final response." As to Bruno's ability to detect illegal drugs, Catalano testified:

> Bruno's never had a false positive, I guess. I mean he's never alerted false. He never falsed on anything.

> \* \* \*

> In training he's never falsed. Wherever he alerts there's a drug. He's never alerted to, say, a blank vehicle. Out on the street there's been times where he's alerted and the trooper searching that vehicle has not found the drug. That's not saying that there wasn't a drug there previously.

> \* \* \*

> Or even—or if that trooper found the drugs in the car, I've had people admit that—some people admit they were smoking marijuana in the car a day or two prior, maybe earlier that day.

Of significance here, Catalano agreed that, even if drugs were no longer present in a vehicle, Bruno could alert to a residual odor. Indeed, Catalano acknowledged that "there have been alerts by Bruno previously where there hadn't been drugs in the car," but drugs had been in the vehicle up to 72 hours prior to the scan. The following colloquy is pertinent:

> [APPELLEE'S COUNSEL]: Would [Bruno] he be able to detect CDS that were present in the vehicle in the past; in

other words, that weren't there on that day that may have been there in the recent past?

[TROOPER CATALANO]: Typically the way we're trained is that the vehicle has no drugs in it at all, the residual odor of a drug can last up to 72 hours.

[APPELLEE'S COUNSEL]: *So he would have alerted if drugs would have been there in the 72 hours that give off an odor that he's been trained for?*

[TROOPER CATALANO]: *He could, he could show an indication.*

[APPELLEE'S COUNSEL]: Okay. Would he also have alerted if the passenger and or driver, let's say, would have—the passenger on this day would have had drugs on their person and gotten out of that vehicle and you run a scan on the vehicle, could there still be an alert?

[TROOPER CATALANO]: If there was a drug in there within 72 hours or recently, a residual odor in that vehicle.

[APPELLEE'S COUNSEL]: So in other words, if someone smoked marijuana there the day before, let's say, and there still could be a residual odor?

[TROOPER CATALANO]: That's correct.

[APPELLEE'S COUNSEL]: Or if a passenger had been in the vehicle, gotten out of the vehicle and gone someplace else, [sic] still could be a residual odor is it [sic] fair to say?

[TROOPER CATALANO]: That's correct. That's what I'm told.

(Emphasis added).

During voir dire, Catalano also testified about what occurred on the date in question. He stated:

On this date I circled Bruno around the vehicle. Bruno approached the driver's side front door; and at the rear portion of that front door Bruno kicked his head back, which indicates to me that he caught an odor of a, one of the drugs that he's trained in. He kicked back. He ran his nose along the seam of that door. He started pawing at the door and then he went into a sit.

State Trooper First Class Christopher Connor testified that he "advised" Cabral that they had "located a false compartment [in the vehicle] and that we were attempting to access it and I asked for his cooperation." [5] Cabral then spoke in Spanish to his passenger, and reported to Connor that "the compartment was broken and that it would not open."

Appellee did not testify or call any witnesses. The hearing was continued, however, in order to allow the State to play the digital recording of the traffic stop. The court said: "I think it's good to see the order of events, all that."

When the hearing resumed on March 17, 2004, the prosecutor explained that he had issued a subpoena to the State police "for production of the equipment necessary to play that CD." [6] In addition, he reported that an "unsuccessful" attempt was made to transfer the CD to "VHS format." Further, the prosecutor stated that an attempt was "made to transfer it to a CD that would play [on] a computer," but that effort also proved "unsuccessful" and caused "some damage to the cassette format."

The prosecutor also informed the court that he and defense counsel "had the actual CD itself" that morning, and "tried to play it" on a court computer, but they were "unable to do [so]," despite the aid of "one of the resident computer gurus in the courthouse . . . ." The following colloquy ensued:

[THE COURT]: Well, I mean I would certainly want to know why this CD can't be played.

[PROSECUTOR]: Well, Your Honor, I don't know. I mean I know—I believe that we made the best good faith efforts

---

5. On cross-examination, Connor testified that, prior to discussing the compartment with appellee, he did not advise appellee of his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

6. The parties interchangeably referred to a DVD and a CD. "CD" refers to "compact disc." MERRIAM WEBSTER'S COLLEGIATE DICTIONARY (1993), at 183. "Compact disc" is defined as a small plastic optical disc, which commonly contains recorded music or computer data. MERRIAM WEBSTER'S COLLEGIATE DICTIONARY (1993), at 233.

we can make to try to get it into a posture of playing it for the Court and counsel. I'm saying, you know, it's kind of like any other evidence that in the absence occurred, and the question is is there an explanation for the absence. I've given the Court the explanation that has been given to me.

[THE COURT]: I understand that. That's all you have.

[PROSECUTOR]: Well, all I'm saying is that at this point it appears that someplace in the process, I mean—and I'm only assuming now, but it appears someplace in the process, in essence, that CD was destroyed from the perspective of not being able to play it back. I got a physical CD and, again, [defense counsel] and I both handled that thing trying to get it to play ... but we haven't been able to do that.... [M]y position would be that there's no, there's no inference that could be drawn adverse to the State simply because we have been unable to produce that CD.

Defense counsel acknowledged that he had spoken "directly" with the "computer guru in the courthouse," and "it appeared" that the CD was "absolutely blank." Nevertheless, he argued: "[I]t's the defendant's position in this case that there is evidence out there that's available; it just is the state has placed it into a format that they can't reproduce it for us to look at. As a result of that, I'm severely—my client is severely prejudiced." The court replied: "You have a right— the law is clear, it's considered the best evidence rule and it's going to be—if you want it in, it's going to be the [S]tate's burden to show and prove by evidence that it can't be used...."

The court indicated that it wanted "to hear evidence from the [S]tate [police] about why that thing is not available." Then, the court recessed to allow the State to procure an "external drive," which the prosecutor thought might enable him to play the digital recording. Although the drive was brought to court, the State was still unable to play the recording. The prosecutor explained:

... First Sergeant Davis of the Maryland State Police brought up here to Cecil County an external drive, which

was thought to be able to play the DVD. I might add First Sergeant Davis doesn't have any expertise in computers. He was simply the chauffeur for bringing that up here, Your Honor. Again, I apologize. So, First Sergeant has no computer expertise. He brought the drive up here.

We went upstairs to the computer personnel for the county; and Chris, the head of the computer operations, has indicated that he's tried every way possible to actually view this DVD today and it just can't be done. We're not sure whether it's the external drive, whether it's the DVD itself, but in any event, it's impossible to do that.

Accordingly, Trooper Spinner was recalled. He testified that, at the time of the traffic stop, his vehicle was equipped with a recording device known as "Custom electronics digital eyewitness, which records on a DVD RAM." [7] It records "both visual and audio." The following colloquy is pertinent:

[PROSECUTOR]: You're aware that when we were here for court on the motions hearing the last time around, you indicated that you were unable to play that DVD on a standard computer DVD drive; is that correct?

[TROOPER SPINNER]: That's correct.

[PROSECUTOR]: Subsequent to that hearing did you have occasion to deliver that CD or DVD to other Maryland State Police personnel for purposes of copying it on to a medium that we could use here?

[TROOPER SPINNER]: That's correct, I did.

[PROSECUTOR]: Okay. Now, once you delivered that, the only other information you have about it is what was related to you by others; is that correct?

[TROOPER SPINNER]: That's correct.

[PROSECUTOR]: Okay. What were you told, though, with respect to what had occurred with that DVD?

---

7. "RAM" or "Random-access memory" is defined as "a computer memory that provides the main internal storage available to the user for programs and data." MERRIAM WEBSTER'S COLLEGIATE DICTIONARY, 967.

[TROOPER SPINNER]: I was told that the DVD was taken to headquarters and that they were unable to make a copy of it there.

[PROSECUTOR]: Was there any indication as to why they were unable to?

[TROOPER SPINNER]: No, there was not.

[PROSECUTOR]: Okay. Excuse me. The DVD that we're talking about here, have you had occasion to actually look at that DVD; that is, to see the images recorded on that?

[TROOPER SPINNER]: I have viewed them only in my patrol car while the DVD was still in the recording unit in my trunk. Since it has been changed out, I've not viewed it since then.

\* \* \*

In my patrol car I have the ability to rewind and play it again to view what's been previously recorded, so I did so with this stop. And since then I have not viewed this particular stop in the external drive, you know, in any other manner.

\* \* \*

I did see it playing [in the patrol car] because I took notes from that reference to my report.

[PROSECUTOR]: And now today—I'm sorry, backing up. Once you had turned that DVD over to other [Maryland State Police] personnel to try to copy, did there come a time when you got back your original DVD?

[TROOPER SPINNER]: Yes, I did.

[PROSECUTOR]: And you have that with you today?

[TROOPER SPINNER]: Yes, I do.

[PROSECUTOR]: And have we attempted today to try to view that through the media players available within the courthouse?

[TROOPER SPINNER]: Yes, we have. We tried not only the court computers here at the Circuit Court, we also tried

attaching the external drive that was relayed up here by First Sergeant Davis, and all those attempts were unsuccessful.

According to Spinner, the DVD recording began within seconds of when Spinner activated his emergency equipment to effectuate the traffic stop of Cabral's vehicle. Spinner testified that the recording would have shown his communications, the arrival of Connor and Catalano, their communications with the occupants of the vehicle, as well as the K–9 scan by Bruno. The recording also was time stamped, so that it would have shown the times associated with the stop.

After Spinner testified, the following exchange occurred:

[PROSECUTOR]: Your Honor, well, I would ask if Mr. Riddle is willing to stipulate that he accompanied us upstairs through the attempts to view this through the computer people.

[THE COURT]: Then you don't have to call them.

[APPELLEE'S COUNSEL]: Yeah, oh, I agree with you; I was upstairs with him. Chris, the person that was the tech guy up there, did all that.

[THE COURT]: Okay. Computer people up there and they couldn't play it.

Appellee's counsel then moved to strike the troopers' testimony, on the ground that the recording was the best evidence of the stop, and would have revealed whether appellee was following a vehicle too closely; the communications between the officers; and the time frame from the stop to the K–9 scan. Appellee's counsel also asked the court to suppress "the stop of the vehicle, the search of the vehicle, and any statements my client gave."

In response, the State asserted "that [the] videotape or DVD recording of a stop is not the best evidence. That is supplemental evidence to what he testified to from the stand." Further, the State argued: "The best evidence rule is that if you can't produce the best evidence available in the way of documentary evidence, that if you can show the reason for the

absence of that best evidence, then you can go ahead with the secondary evidence." Moreover, the State noted that there are instances when the "equipment doesn't work, is muffled or is not clear," or "people block the view of some of the things that are going on around a vehicle in these types of stops."

The court ruled from the bench:

Well, here's what I find is that the best evidence rule in this case would be the tape. And not through any fault of [the prosecutor] and, from what I've heard, no fault of Trooper Spinner, that CD is not available to the Court, and there's been absolutely no reason given about why it's not available. That was given to third parties and in the state police. They've had plenty of time—and I know [the prosecutor] put something on about this before. They've had plenty of time to come up here and explain exactly what happened, why that CD will not operate. I get no explanation at all other than the fact it won't operate. And I can't, certainly can't blame [the prosecutor] or Trooper Spinner. They're not computer geniuses and neither is the first sergeant, but that is the best evidence. And the next thing here, I just have no reason at all for it not being able to be played.

The next thing here is kind of a, I don't know if it's necessary of [sic] the outcome of the case, but the testimony of the K–9 handler is that the K–9 alerted. And he's only had one year experience; can be based on either drugs being there or drugs having been there in the last 72 hours, and there's not one iota of evidence to indicate any difference between how the dog alerts.

And I'll say for future cases, because it's not before me in this case, but there's been testimony by other officers that a dog alerts to a lot of other things besides this, too. I don't find under these circumstances that the K–9 or the handler are even experts, because although they weren't—wasn't required in detail, but it was somewhat, they don't know what the dog will alert to, what it will not alert to, what other kind of substances can cause the alert, and other troopers have testified in other cases that just legal drugs

with opiates in them can cause alert. I just think it's something the state police need to take up with.

And I don't find under those circumstances that either the trooper or the dog under those circumstances are experts in being able to tell are [sic] there drugs presently available, are present in the vehicle at the time of the alert. And based on that, I'm granting the motion for—the motion to suppress evidence.

After the court ruled, the following colloquy ensued:

[PROSECUTOR]: If I may, Your Honor. Again, I would ask that [defense counsel] stipulate to this: The computer people upstairs were unable to offer any explanation as to why.

[THE COURT]: Is that correct, [defense counsel]?

[APPELLEE'S COUNSEL]: Right. They didn't know why it would not run. It wouldn't run.

[THE COURT]: Let the record reflect the computer people are connected with this county office building. They're not part of the state police, but yeah, I'll accept that proffer.

We shall include additional facts in our discussion.

## DISCUSSION

### I.

The State argues that "the motions court erred when it ruled that the alert by a trained and certified drug dog did not provide probable cause to search Cabral's vehicle." It claims that the circuit court erred because Maryland's appellate courts "have clearly decided the issue of whether an alert by a drug dog provides probable cause...." Thus, the State asserts that, "[f]ollowing the alert by Bruno, there was a probability that one of the drugs Bruno had been trained to detect was present inside the vehicle. Accordingly, probable cause existed to search Cabral's vehicle...."

According to the State, the suppression court's ruling was erroneously premised "on the concept that Bruno could have

alerted based on residual odor." In its view, probable cause was not undermined merely because the dog might have alerted to a residual odor. The State argues:

Ultimately, the rule that should have been applied by the trial court in this case is the simplest and easiest to apply. If a trained drug dog alerts on a vehicle, that *ipso facto* establishes probable cause which will authorize a warrantless search of that vehicle. Thus, the trial court clearly erred when it ruled that Bruno's alert did not amount to probable cause to search the vehicle. Cabral's motion to suppress should have been denied and reversal is required.[8]

In a footnote in its brief, the State addresses the best evidence issue, claiming that the suppression court "also erred when it ruled that the video recording of the stop was the 'best evidence'...." According to the State, the best evidence rule does not apply here, because the purpose of the best evidence rule is to require the production of an original writing when the terms of the writing are material. In its view, "the video simply added weight to the officer's testimony concerning the stop, and the State was not seeking to prove the contents of the video."

Cabral insists that the court below based its decision on the best evidence rule, and that "the Court's mention of the reliability of a K–9 alert was dicta." Moreover, he maintains that "[i]t was proper for the Motions Court not to allow

---

8. As the State observes, this case does not present "the issue of whether Bruno could distinguish between legal and illegal drugs...." Nor does it present

any issue with whether the scan of Cabral's vehicle required reasonable articulable suspicion, an issue which the Supreme Court has recently granted certiorari in *Illinois v. Caballes*, —— U.S. ——, 124 S.Ct. 1875, 158 L.Ed.2d 466 (2004)(No. 03–923), because, the issue was not raised and it is clear that a K–9 scan is not a search. *See United States v. Place*, 462 U.S. 696 [, 707, 103 S.Ct. 2637, 77 L.Ed.2d 110] (1983) [ ("Therefore, we conclude that the particular course of investigation that the agents intended to pursue here—exposure of respondent's luggage, which was located in a public place, to a trained canine—did not constitute a 'search' within the meaning of the Fourth Amendment.") ].

secondary evidence in this case. . . ." Appellee explains: "The fact is that at one time there was a recording of the stop and that the State Police failed to provide the necessary equipment that was available to them for the recording to be viewed."

Cabral also contends that "there is a serious question of reliability as to what the dog may or may not alert to," because of the possibility that the dog alerted to a residual odor. Given the "testimony that the dog would detect if there had been drugs in the car or on someone in the car up to 72 hours of the sniff," Cabral maintains that "the reliability of a positive drug dog sniff" was "seriously undermine[d]." He adds: "[I]n a case such as this where the positive K-9 sniff provides almost all the basis for the probable cause, the reliability of the dog and the sniff are of the utmost importance." Appellee thus "urges the Court to evaluate its position on the reliability of the K-9 sniff in light of the fact that the dog can give a false positive based on residual odors."

Our review of the trial court's ruling with respect to a suppression motion is based solely on the record of the suppression hearing. *Dashiell v. State,* 374 Md. 85, 93, 821 A.2d 372 (2003); *see State v. Collins,* 367 Md. 700, 706–07, 790 A.2d 660 (2002); *Cartnail v. State,* 359 Md. 272, 282, 753 A.2d 519 (2000). We review the evidence in the light most favorable to the prevailing party. *Stokes v. State,* 362 Md. 407, 414, 765 A.2d 612 (2001); *Charity v. State,* 132 Md.App. 598, 605–06, 753 A.2d 556, *cert. denied,* 360 Md. 487, 759 A.2d 231 (2000). In this endeavor, "[w]e accept the suppression court's first-level factual findings unless clearly erroneous, and give due regard to the court's opportunity to assess the credibility of witnesses." *Faulkner v. State,* 156 Md.App. 615, 640, 847 A.2d 1216 (2004); *State v. Fernon,* 133 Md.App. 41, 44, 754 A.2d 463 (2000).

However, "[w]hen the question is whether a constitutional right . . . has been violated, the reviewing court makes its own independent constitutional appraisal, by reviewing the law and applying it to the peculiar facts of the particular case." *Jones v. State,* 343 Md. 448, 457, 682 A.2d 248 (1996); *see*

*Dashiell,* 374 Md. at 93–94, 821 A.2d 372; *Stokes,* 362 Md. at 414, 765 A.2d 612; *Faulkner,* 156 Md.App. at 640, 847 A.2d 1216. In other words, we must consider the first-level facts and determine as a matter of law whether the police had probable cause to search. As the reviewing court, our task is " 'to make a practical. common-sense decision whether probable cause exists.' " *McDonald v. State,* 347 Md. 452, 467, 701 A.2d 675 (1997) (citation omitted), *cert. denied,* 522 U.S. 1151, 118 S.Ct. 1173, 140 L.Ed.2d 182 (1998).

## II.

■ We shall first address the issue of whether the State had probable cause to conduct a warrantless search of the vehicle based on the positive alert of a trained drug dog. This requires us to review the concept of probable cause in the context of a warrantless vehicle search.

■ A warrantless search of a vehicle is permitted if there is probable cause to believe that the vehicle contains contraband. *See Wyoming v. Houghton,* 526 U.S. 295, 300, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999); *United States v. Ross,* 456 U.S. 798, 799, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); *Carroll v. United States,* 267 U.S. 132, 155–56, 45 S.Ct. 280, 69 L.Ed. 543 (1925). In general, the automobile exception to the warrant requirement is premised upon the exigencies associated with the mobility of a vehicle, *Carroll,* 267 U.S. at 153, 45 S.Ct. 280, and the diminished expectation of privacy with regard to a vehicle. *California v. Carney,* 471 U.S. 386, 390–93, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985).

What this Court said in *Brown v. State,* 132 Md.App. 250, 752 A.2d 620 (2000), *aff'd.,* 364 Md. 37, 770 A.2d 679 (2001), provides guidance:

One of the core protections of the Fourth Amendment is the warrant requirement. There is, however, a lesser expectation of privacy associated with automobiles and, because they are inherently mobile, a warrantless search of a vehicle is permitted under certain circumstances. "If a car is readily mobile and probable cause exists to believe it

contains contraband, the Fourth Amendment ... permits police to search the vehicle without more." This exception was derived from *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), and has since been referred to as the "Carroll doctrine."

132 Md.App. at 261, 752 A.2d 620 (internal citations and footnote omitted).

Writing for this Court in *Berry v. State*, 155 Md.App. 144, 176, 843 A.2d 93, *cert. denied*, 381 Md. 674, 851 A.2d 594 (2004), Judge Barbera explained:

> The United States Supreme Court, in a series of cases harkening back almost 80 years, has recognized an exception to the warrant requirement that allows the police, when they have probable cause to believe a vehicle contains contraband or evidence of a crime, to search the vehicle for that contraband or evidence of a crime and seize it, without a warrant. *See Maryland v. Dyson*, 527 U.S. 465, 466–67, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999) (*per curiam*); *Pennsylvania v. Labron*, 518 U.S. 938, 940, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996) (*per curiam*); *California v. Carney*, 471 U.S. 386, 390, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985); *United States v. Ross*, 456 U.S. 798, 806–07, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); *Carroll v. United States*, 267 U.S. 132, 149, 45 S.Ct. 280, 69 L.Ed. 543 (1925). It is clear from these cases that "the automobile exception does not have a separate exigency requirement: 'If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment ... permits police to search the vehicle without more.'" *Dyson*, 527 U.S. at 467, 119 S.Ct. 2013 (citation omitted).

*See Nathan v. State*, 370 Md. 648, 665–66, 805 A.2d 1086 (2002) ("Police officers who have probable cause to believe that there is contraband or other evidence of criminal activity inside an automobile that has been stopped on the road may search it without obtaining a warrant.... If supported by probable cause, every part of a vehicle that may conceal the object of the search may be searched.") (citations omitted),

*cert. denied sub nom., Shaw v. Maryland,* 537 U.S. 1194, 123 S.Ct. 1303, 154 L.Ed.2d 1029 (2003).

Probable cause means "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *see United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *State v. Lee,* 330 Md. 320, 326, 624 A.2d 492 (1993); *Birchead v. State,* 317 Md. 691, 700, 566 A.2d 488 (1989). Probable cause requires " 'less evidence for such belief than would justify conviction but more evidence than that which would arouse a mere suspicion.' " *Carroll v. State,* 335 Md. 723, 735, 646 A.2d 376 (1994) (citation omitted). Moreover, it is assessed by considering "the totality of the circumstances in a given situation.... " *Collins v. State,* 322 Md. 675, 680, 589 A.2d 479 (1991); *Howard v. State,* 112 Md.App. 148, 160–61, 684 A.2d 491 (1996), *cert. denied,* 344 Md. 718, 690 A.2d 524 (1997).

In determining whether a search was founded on probable cause, hyper-technical analysis, divorced from the realities of everyday life, is not required. *See Potts v. State,* 300 Md. 567, 573, 479 A.2d 1335 (1984). As the Supreme Court explained in *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949): "In dealing with probable cause ..., as the name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *See Gates,* 462 U.S. at 231, 103 S.Ct. 2317 (reiterating that "the central teaching of [its] decisions bearing on the probable-cause standard is that it is a 'practical, nontechnical conception.' " *Id.* at 231, 103 S.Ct. 2317 (quoting *Brinegar,* 338 U.S. at 176, 69 S.Ct. 1302)).

More recently, in addressing probable cause, the Supreme Court has said:

The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circum-

stances.... We have stated, however, that "[t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt," ... and that the belief of guilt must be particularized with respect to the person to be searched or seized....

*Maryland v. Pringle*, 540 U.S. 366, ——, 124 S.Ct. 795, 800, 157 L.Ed.2d 769 (2003) (citations omitted).

Numerous cases in Maryland have addressed the issue of whether, and under what circumstances, a positive alert by a drug dog gives rise to probable cause to search. In *Wilkes v. State*, 364 Md. 554, 774 A.2d 420 (2001), for example, the Court said: "We have noted that once a drug dog has alerted a trooper 'to the presence of illegal drugs in a vehicle, sufficient probable cause exist[s] to support a warrantless search of [a vehicle].' " *Id.* at 586, 774 A.2d 420 (quoting *Gadson v. State*, 341 Md. 1, 8, 668 A.2d 22 (1995), *cert. denied*, 517 U.S. 1203, 116 S.Ct. 1704, 134 L.Ed.2d 803 (1996)). *See also State v. Wallace*, 372 Md. 137, 145, 159, 812 A.2d 291 (2002) (noting that "canine sniff" of the vehicle "provided the police officers with probable cause to search the car," but concluding that a canine alert on the exterior of a vehicle does not provide probable cause to search a particular occupant of that vehicle), *cert. denied*, 540 U.S. 1140, 124 S.Ct. 1036, 157 L.Ed.2d 951 (2004); *McKay v. State*, 149 Md.App. 176, 188, 814 A.2d 592 (2002) (stating that failure of drug dog to detect drugs does not negate probable cause and is only one factor to be considered in the analysis of probable cause); *Carter v. State*, 143 Md.App. 670, 674, 795 A.2d 790 ("The dog 'alert' supplied the probable cause for a warrantless search of the van."), *cert. denied*, 369 Md. 571, 801 A.2d 1032 (2002); *State v. Funkhouser*, 140 Md.App. 696, 711, 782 A.2d 387 (2001)("When a qualified dog signals to its handler that narcotics are in a vehicle ... that is *ipso facto* probable cause to justify a warrantless *Carroll* Doctrine search of the vehicle."); *Timmons v. State*, 114 Md.App. 410, 417, 690 A.2d 530 (1997) (stating "that a positive alert by a certified drug-sniffing canine is sufficient to establish probable cause to search"); *Emory v. State*, 101 Md.App. 585, 647 A.2d 1243 (1994) (upholding issuance of

search warrant when claim of probable cause was based in part on a positive alert for drugs by canine, despite claim of insufficient showing of dog's reliability), *cert. denied,* 337 Md. 90, 651 A.2d 855 (1995); *In re Montrail M.,* 87 Md.App. 420, 437, 589 A.2d 1318 (1991) (stating that "[t]he dog's reaction properly served as probable cause to search the vehicle"), *aff'd.,* 325 Md. 527, 601 A.2d 1102 (1992); *Snow v. State,* 84 Md.App. 243, 248, 578 A.2d 816 (1990) (stating that canine alert at perimeter of car "could be held to provide probable cause to search the interior of the car.").

Despite the plethora of cases involving drug detecting dogs, we have not found any Maryland case that has discussed the issue of probable cause in light of evidence that the canine has the capacity to alert to a residual odor. Here, appellee attacks the State's claim of probable cause precisely because of the possibility that the dog might have alerted to a stale odor of contraband. Indeed, appellee contends that, in a case such as this one, in which the positive K–9 sniff provided the entire basis for the claim of probable cause, the reliability of the dog and the sniff are of singular importance.

In effect, appellee's contention as to the prospect of an alert to a residual odor is an argument as to staleness. To be sure, one of the factors in the "probable cause puzzle" concerns the staleness of the information on which the claim of probable cause is based. *See West v. State,* 137 Md.App. 314, 327–28, 768 A.2d 150, *cert. denied,* 364 Md. 536, 774 A.2d 409 (2001). But, staleness "is not a rigid concept." *Behrel v. State,* 151 Md.App. 64, 88, 823 A.2d 696, *cert. denied,* 376 Md. 546, 831 A.2d 5 (2003). Nor is there a " 'bright-line' rule" to define staleness. *West,* 137 Md.App. at 348, 768 A.2d 150. Rather, the concept of staleness depends on the particular circumstances of the case. *Behrel,* 151 Md.App. at 88, 823 A.2d 696.

Arguably, "the olfactory superiority of dogs" is both a strength and a "weakness" in regard to the probable cause analysis. *Matheson v. Florida,* 870 So.2d 8, 13 (2003), *rev. granted,* 880 So.2d 1212 (Fla. August 17, 2004). It is the dog's keen sense of smell that makes the canine such a valuable law

enforcement tool. Yet, that same ability may enable a dog to detect an odor from drugs that are no longer present in the place where the odor is detected.

Although *Fitzgerald v. State*, 153 Md.App. 601, 837 A.2d 989 (2003), *cert. granted*, 380 Md. 617, 846 A.2d 401 (2004), is factually distinguishable, it remains instructive. There, we considered "the reasonableness of using a drug-sniffing canine [outside an apartment] to gather probable cause for a search warrant." *Id.* at 614, 837 A.2d 989. In particular, the Court focused on whether the warrant application established probable cause, and whether the search warrant application was "fatally compromised" by omission of information regarding the dog's reliability. *Id.* Writing for this Court, Judge Moylan concluded that the canine's alert at the door of the defendant's apartment was *"ipso facto* enough to establish probable cause." *Id.* at 619, 837 A.2d 989.[9]

Unlike in this case, in which there was considerable evidence as to Bruno's training and reliability, in *Fitzgerald* the warrant application was devoid of any information as to the dog's training and reliability, "beyond the mere [general] assertion that he is 'a certified drug detecting dog.' " *Id.* at 631, 837 A.2d 989 (italics omitted). Nevertheless, the *Fitzgerald* Court found "facially valid" the "assertion in the warrant application that [the] 'canine is a certified drug detecting dog and scans have resulted in numerous arrests'...." *Id.* at 637, 837 A.2d 989. The Court concurred with the trial judge, who wrote:

> "When a canine has been certified in contraband detection, it is not within the magistrate's responsibility or training to re-analyze the statistical record for each canine whose sniff is presented as support for the issuance of a search and seizure warrant, how the canine signals to its handler or how long is appropriate for a response to be made. As in the *Emory [, supra,]* and [*United States v.*]

___

9. The Court of Appeals has granted *certiorari* to consider whether the use of a drug detecting dog outside of an apartment door constitutes a search under the Fourth Amendment.

*Meyer* [, 536 F.2d 963 (1st Cir.1976) ] discussion *supra,* a magistrate must be able to defer generally to the skill of a trained handler and the certifying agency unless there is a clear example of abuse."

*Id.* at 638, 837 A.2d 989 (emphasis added in *Fitzgerald* ).

Several jurisdictions have considered whether a finding of probable cause is negated because of the potential for a trained canine to alert to a residual order, or to legal drugs, or to contraband that the dog has not been specifically trained to detect. These cases persuade us that appellee's argument is at odds with the concept of probable cause.

In *State v. Carlson,* 102 Ohio App.3d 585, 657 N.E.2d 591 (1995), the trial court ordered the suppression of drugs recovered during a traffic stop after a drug dog alerted to the vehicle. *Id.* at 593. The trial court opined, *id.* at 601:

"[D]ogs alert to smells that remain for quite a time and may falsely alert. That is, the dog may be alerting to something that had been in the vehicle several days previously. Since police officers obtaining a warrant to search are required to have up-to-date information, and cannot obtain a warrant based on stale information, it is perhaps unjustified to allow a search based on what may be stale smells."

On appeal, the Ohio court considered, *inter alia,* "whether the drug dog's alert to the odor of narcotics constituted probable cause to search the [defendant's] pickup." *Id.* at 597. The appellate court declined to adopt the trial court's suggestion "that a dog alert, by itself, does not constitute probable cause to search a detained vehicle." *Id.* at 601.

The *Carlson* court concluded that, "once a trained drug dog alerts to the odor of drugs from a lawfully detained vehicle, an officer has probable cause to search the vehicle for contraband." *Id.* It also dismissed the trial court's concern as to a possible alert to a "stale odor." *Id.* Characterizing the "stale odor argument" as "fanciful but unpersuasive," *id.,* the court stated that "the test for staleness is whether the available information justifies a conclusion that contraband is *probably* on the person or premises to be searched." *Id.* at 602

(emphasis in *Carlson*). Moreover, the court was of the view that " 'there is no arbitrary time limit on how old information ... can be.' " *Id.* (citation omitted).

*United States v. Johnson*, 660 F.2d 21 (2d Cir.1981) (per curiam), is also instructive. There, the defendant claimed that the drug dog's alert did not create probable cause to support the issuance of a search warrant for his luggage. *Id.* at 22. He argued that the dog was "incapable of distinguishing between the actual presence of drugs in a container and the residual odor when the controlled substances are no longer there...." *Id.* The Second Circuit rejected that contention as a misapprehension of the concept of probable cause. It said, *id.* at 22–23:

> [A]ppellant's argument with respect to the problem of a dog detecting only the residual odors as opposed to the drugs themselves misconstrues the probable cause requirement. Absolute certainty is not required by the Fourth Amendment. What is required is a reasonable belief that a crime has been or is being committed.

*See also State v. Braendle*, 134 Idaho 173, 997 P.2d 634, 637 (App.2000) (upholding warrantless vehicle search because "the police possessed probable cause to believe there was contraband in the vehicle", despite the fact that drug dog had previously given false positive reactions in response to residual odor of drugs); *Dawson v. State*, 238 Ga.App. 263, 518 S.E.2d 477, 481 (1999) (finding that "there was significant evidence of [dog's] reliability and training" in detecting drugs, and observing that "there is no way to verify whether the dog actually detected a residual odor of contraband or whether it made a false alert"). *But see Matheson, supra*, 870 So.2d at 14 ("[W]e conclude that the fact that a dog has been trained and certified, standing alone, is insufficient to give officers probable cause to search based on the dog's alert.").

In *United States v. Outlaw*, 319 F.3d 701 (5th Cir.2003), the Fifth Circuit upheld the district court's denial of a motion to suppress where a trained drug dog alerted to luggage found to contain PCP, despite the fact that the dog was not trained to

detect PCP. The court stated: "That the suitcase the canine alerted to later turned out to contain PCP, a drug the dog was not trained to detect, simply does not vitiate the agent's reasonable suspicion under these facts." *Id.* at 704. *See also United States v. Robinson*, 707 F.2d 811, 815 (4th Cir.1983) (rejecting defendant's claim that dog's alert to package did not constitute probable cause, because dog was not trained to detect the substances in the package; "[The drug dog's] initial detection ... was sufficient to establish probable cause for a search for controlled substances—the fact that a different controlled substance was actually discovered does not vitiate the legality of the search"); *United States v. McCranie*, 703 F.2d 1213, 1215, 1218 (10th Cir.1983) (holding that the "signals" given by dog trained to detect explosives, not drugs, nevertheless gave rise to reasonable suspicion that the defendant's luggage contained contraband and police properly held luggage pending application for search warrant), *cert. denied*, 464 U.S. 992, 104 S.Ct. 484, 78 L.Ed.2d 680 (1983); *United States v. Viera*, 644 F.2d 509, 511 (5th Cir.1981) (challenging denial of motion to suppress quaaludes found in suitcases, because dogs were trained to detect other drugs; "It is true that the [drug] dogs were not trained to react to quaaludes, and that the discovery of the quaaludes can in this respect be characterized as fortuitous. However, that conclusion is not grounds for suppression of the evidence."), *cert. denied*, 454 U.S. 867, 102 S.Ct. 332, 70 L.Ed.2d 169 (1981).

These cases lead us to conclude that Cabral is "barking up the wrong tree." He has confused probable cause with proof beyond a reasonable doubt. If a trained drug dog has the ability to detect the presence of drugs that are no longer physically present in the vehicle or container, but were present perhaps as long as 72 hours prior to the alert, such an ability serves to strengthen the argument that the dog has a superior sense of smell on which to rely to support a finding of probable cause. The possibility that the contraband may no longer be present in the vehicle does not compel the finding that there is no probable cause; for purposes of the probable cause analysis, we are concerned with probability, not certain-

ty. The issue of a possible alert to a residual odor is a factor to be considered by the trial court, but it is not dispositive.

We are reminded of what Judge Moylan wrote in *Fitzgerald*, recognizing the reliability of a trained drug dog.

"[T]he instant court sees a positive alert from a law enforcement dog trained and certified to detect narcotics as inherently more reliable than an informant's tip. Unlike an informant, the canine is trained and certified to perform what is best described as a physical skill. The personal and financial reasons and interest typically behind an informant's decision to cooperate can hardly be equated with what drives a canine to perform for its trainer. The reliability of an informant is really a matter of forming an opinion on the informant's credibility either from past experience or from independent corroboration. With a canine, the reliability should come from the fact that the dog is trained and annually certified to perform a physical skill."

*Fitzgerald*, 153 Md.App. at 637, 837 A.2d 989 (quoting *United States v. Wood*, 915 F.Supp. 1126, 1136 n. 2 (D.Kan.1996))(italics omitted).

Accordingly, we hold that the circuit court erred in finding that there was no probable cause because Bruno might have alerted to the presence of an illegal drug that was in the vehicle as much as 72 hours before the alert.

## III.

 We turn to consider the court's best evidence ruling. As we indicated, it was predicated on the State's inability to play Trooper Spinner's recording of the traffic stop.

Appellee maintains:

Here, the State cannot say that the recording was not made available and then destroyed without fault. The State police failed to provide the equipment necessary to play the recording in the first instance. The State Police then destroyed the only copy of the recording due to their negligence in attempting to transfer the medium of the

recording. Would it not have been advisable to make a copy of the recording before attempting to transfer it's [sic] contents onto another medium. It follows that the State Police is an agent of the State's Attorney and their fault and negligence is imputed to them.

Cabral contends that the State's failure to produce the recording prejudiced him and denied him due process, in that "[t]he tape would show the basis for the initial stop, the duration of the stop, whether the drug dog alerted, whether any statements were made etc." Further, Cabral maintains that "the destruction of the tape was in effect a suppression of exculpatory evidence." He states: "The tape was material evidence of the defendant's guilt or innocence."

In our factual summary, we reviewed at length what occurred in regard to the recording. The record reveals that, at the March 2004 hearing, the State produced a recording of the traffic stop but was unable to play it, either because of a defect in the recording or in the equipment used to play it.

The Court of Appeals has "long recognized that the Best Evidence Rule is applicable in criminal cases in Maryland." *Carter v. State*, 367 Md. 447, 469, 788 A.2d 646 (2002) (Raker, J., dissenting). The requirements of the best evidence rule are found in Maryland Rules 5–1001 through 5–1008.

Maryland Rule 5–1001(a) provides, in pertinent part: " 'Writings' and 'recordings' consist of letters, words, numbers, or their equivalent, set down by handwriting, typewriting, printing, photostating, photographing, magnetic or optical impulse, mechanical or electronic recording, or other form of data compilation." Maryland Rule 5–1002 provides: "To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by statute."

Maryland Rule 5–1004 is also relevant. It states:

The contents of a writing, recording, or photograph may be proved by evidence other than the original if:

(a) Original lost or destroyed. All originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith;

(b) Original not obtainable. No original can be obtained by any reasonably practicable, available judicial process or procedure;

(c) Original in possession of opponent. At a time when an original was under the control of the party against whom offered, that party was put on notice, by the pleadings or otherwise, that the contents would be a subject of proof at the hearing or trial, and that party does not produce the original at the hearing or trial; or (d) Collateral matters. The writing, recording, or photograph is not closely related to a controlling issue.

In addition, C.J. § 10–102 is pertinent. It provides:

(a) *In general.*—If a business, institution, member of a profession or calling, or a department or agency of government, in the regular course of business or activity has kept or recorded a memorandum, writing, entry, print, representation, or a combination of them, of an act, transaction, occurrence, or event, and in the regular course of business has caused any or all of them to be recorded, copied, or reproduced by a photographic, photostatic, microfilm, microcard, miniature photographic, optical imaging, or other process which accurately reproduces or forms a durable medium for so reproducing the original, the original may be destroyed in the regular course of business unless its preservation is required by law. The reproduction, when satisfactorily identified, is as admissible in evidence as the original itself in a judicial or administrative proceeding whether the original is in existence or not and an enlargement or facsimile of the reproduction is likewise admissible in evidence if the original reproduction is in existence and available for inspection under direction of the court. The introduction of a reproduced record, enlargement, or facsimile does not preclude admission of the original.

(b) *Uniformity of interpretation.*—This section shall be interpreted and construed to effectuate its general purpose of making uniform the law of those states which enact it. (c) *Short title.*—This section may be cited as the Maryland Uniform Photographic Copies of Business and Public Records as Evidence Act.

As Professor McLain has explained in her treatise, the best evidence rule "is misleadingly named, as it is not a general requirement that each party present only the 'best evidence' available on every point, so as to preclude other probative evidence." 6A L. McLain, MARYLAND EVIDENCE, § 1001:1, at 535 (2001). What this Court said in *Cooper v. State*, 41 Md.App. 392, 398, 397 A.2d 245 (1979), is also noteworthy:

The Best Evidence Rule states a *preference* for original documents, but does not foreclose use of secondary evidence "after a proper foundation has been laid, showing good and sufficient reasons for the failure to produce the primary evidence." *Forrester v. State*, 224 Md. 337, 349, 167 A.2d 878, 884 (1961). The issue usually arises when the original document has been lost or destroyed.

Appellee cites *Green v. State*, 25 Md.App. 679, 337 A.2d 729, *cert. denied*, 275 Md. 749 (1975), to support his position. It does not advance his cause. In *Green*, the appellant asked: " 'Did the Court err in admitting a typewritten copy of an alleged "corrected" statement of Louis Irvin, an alleged co-conspirator, and did not require instead the playing of a tape recorded version of said statement, which was the "best evidence" in the case?' " *Id.* at 687, 337 A.2d 729 (footnote omitted). The *Green* Court said: "Appellant inaccurately employs the term 'best evidence' which, in its classic application, treats only documentary evidence." *Id.*, n. 3.

The *Green* Court relied on *Forrester v. State*, 224 Md. 337, 167 A.2d 878 (1961). There, the appellant, a police officer, was "convicted of malfeasance in office." *Id.* at 341, 167 A.2d 878. An inspector was asked to testify that a tape "was a dictation recording tape (dictabelt) and a permanent record of the Police Department, made in the normal course of business of

said Department." *Id.* at 348–49, 167 A.2d 878. The tape, which "recorded wire-tapped conversations", was previously played in the inspector's presence and reproduced. *Id.* at 348, 167 A.2d 878. He was asked to relate the conversations, but the State's objection was sustained. *Id.* at 349, 167 A.2d 878. The Court concluded that there was no error, stating:

> Since the tape that was obtained by wire tapping was not made in the presence of the Inspector and he did not claim to recognize any of the voices heard therefrom, his answer to the question, if permitted to be given, would obviously have been hearsay. *And, as no effort was made to produce the original tape, nor any explanation offered for its non-production, the answer called for, if allowed, would have violated the best evidence rule.* The best evidence of which the case is capable must be produced, and *secondary, or inferior, evidence is only admissible after a proper foundation has been laid, showing good and sufficient reasons for the failure to produce the primary evidence.*

*Id.* (Emphasis added).

We need not resolve whether the best evidence rule applies here. We shall assume, instead, that it does. Appellee concedes that " 'oral testimony or other secondary evidence of the terms of the writing' " may be " 'offered as a substitute for the original' " if " 'the proponent can demonstrate an adequate reason for the non-production of the original.' " (Citation omitted). As we see it, that was precisely the situation here.

"Carelessness, recklessness, ordinary negligence, and even gross negligence are all satisfactory explanations" for the absence of an original. Joseph F. Murphy, Jr., MARYLAND EVIDENCE HANDBOOK § 1104(B)(3), at 461 (3d ed.1999). On the other hand, "[i]ntentional destruction to gain an unfair advantage is obviously not a sufficient excuse." *Id.* Here, the record amply demonstrates that the State made repeated, good faith efforts to play the recording, albeit without success. Despite the State's diligent effort to play the recording, it was unable to overcome the unknown technological problems. There was

no suggestion, however, of any intentional misconduct or bad faith on the part of the State.

We conclude that if the testimony as to the stop would have been sufficient to demonstrate probable cause, it is no less so merely because the recording did not function as intended. Accordingly, we conclude that the trial court erred in granting appellee's motion to suppress on the basis of the best evidence rule.

**JUDGMENT OF THE CIRCUIT COURT FOR CECIL COUNTY REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR CECIL COUNTY FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY APPELLEE.**